Opinion
CHIN, J.
Defendant Curtis Lee Ervin appeals from a judgment of the Alameda County Superior Court imposing the death penalty following his conviction of first degree murder (Pen. Code, § 187),[1] accompanied by a special-circumstance finding that he committed the murder for financial gain (§ 190.2, subd. (a)(1)). Defendant’s appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.
I. Facts
The record shows that codefendant Robert McDonald hired defendant Ervin and codefendant Arestes Robinson to kill McDonald’s former wife, Carlene McDonald, for $2,500. On November 7, 1986, defendant and Robinson kidnapped Carlene from her home in El Sobrante and drove in her car to Tilden Park, where they stabbed her to death and left her body. The men were armed with a BB gun resembling a .45-caliber pistol, as well as the knife used to kill Carlene. A patrol officer found Carlene’s fully clothed body the next afternoon. She had been stabbed five times (one wound severing the abdominal aorta), and a brown extension cord encircled her left wrist.
According to the evidence, defendant and Robinson met with Robert McDonald the day after the murder. They presented Carlene’s driver’s license to McDonald as proof of the killing, and he paid them $2,500, which defendant shared with Robinson and others to buy cocaine. McDonald paid defendant an additional $1,700 a couple of weeks after the murder. Sharon Williams, defendant’s girlfriend, testified he gave her a watch and ring later identified as belonging to Carlene. Defendant’s acquaintance, Armond Jack, testified under a grant of immunity that he had driven with defendant to his meeting with McDonald to negotiate the price for killing Carlene. Jack also *67 was present when defendant and Robinson searched for Carlene’s car in a Bay Area Rapid Transit (BART) parking lot. Jack confirmed that, according to defendant, McDonald agreed to pay them $2,500 to kill his ex-wife. Jack also testified he drove defendant and Robinson to Carlene’s apartment on the night of the murder and saw them again the next day. According to Jack, on the way to Carlene’s apartment, defendant asked for and received a knife from Robinson. Jack testified this knife resembled a 13-inch kitchen knife the prosecutor showed him. Jack dropped the men off near Carlene’s apartment.
Ample physical evidence linked defendant to the crime, including his possession of Carlene’s watch, ring, and automobile (which he and Robinson parked near David Willis’s house and sought to have stripped, cleaned, or burned shortly after the murder), and the BB gun found in Willis’s house, resembling the weapon defendant used to kidnap Carlene.
Additionally, defendant admitted various incriminating aspects of the crime to David Willis, Zane Sinnott, Gwyn Willis, and the investigating officer, Sergeant Dana Weaver. According to these witnesses, defendant admitted that the men confronted Carlene, pointed the BB gun in her direction, forced her into her car, and drove to Tilden Park, where defendant stabbed her to death while Robinson held her. The prosecutor also introduced the prior testimony of Robinson’s girlfriend, Gail Johnson, that Robinson admitted participating in the murder.
The defense made no claims of innocence, but sought to impeach or discredit the testimony of prosecution witnesses Jack, Sinnott, and David Willis. Additionally, a psychiatrist, Dr. Fred Rosenthal, testified for defendant that cocaine consumption may have impaired defendant’s thought processes.
At the penalty phase, the prosecutor introduced evidence of defendant’s prior bank robbery conviction and (on rebuttal) evidence of some minor jail disciplinary problems, discussed below. The prosecutor also introduced aggravating evidence (various uncharged assaults) involving codefendant Robinson.
Defendant introduced mitigating background evidence regarding his character, employment, family, drug use, religious involvement, and musical skills. Codefendants McDonald and Robinson likewise presented a variety of mitigating evidence not pertinent here.
The jury returned death verdicts for both defendant and McDonald (who died before his appeal could be heard), but selected life imprisonment without parole for Robinson.
*68 II. Pretrial Issues
A. Motion to Sever
In June 1988, the prosecutor moved to consolidate the case against the three individual defendants, Ervin, Robinson, and McDonald. (See § 1098, requiring joinder of joint charges against multiple defendants unless the court, at its discretion, orders separate trials.) Over defendant’s objection, the court consolidated the counts against the three codefendants.
Later, in February 1990, defendant and Robinson each moved to sever his case from those of his two codefendants. Defendant observed that the prosecutor intended to introduce an edited version of a statement he made to Sergeant Weaver, omitting references to codefendant Robinson in a manner that would lessen its exculpatory impact on defendant’s own case. The court ruled the statement would be inadmissible in its entirety and denied the motion to sever.
Defendant now contends the trial court abused its discretion in denying his motion. He relies primarily on supposed “conflicts” that occurred after the court had denied severance, including (1) excusal of some prospective jurors who indicated they might be unable to impose the death penalty on McDonald, given his lack of a criminal record and his indirect role in the killing, and (2) introduction of evidence admissible against some but not all codefendants, necessitating several limiting instructions. As defendant acknowledges, a motion to sever must be supported by adequate grounds existing at the time the motion is heard. (People v. Miranda (1987) 44 Cal.3d 57, 78 [241 Cal.Rptr. 594, 744 P.2d 1127]; see People v. Cummings (1993) 4 Cal.4th 1233, 1286-1287, fn. 26 [18 Cal.Rptr.2d 796, 850 P.2d 1]; People v. Pinholster (1992) 1 Cal.4th 865, 932 [4 Cal.Rptr.2d 765, 824 P.2d 571].) If further developments occur during trial that a defendant believes justify severance, he must renew his motion to sever. Defendant made no renewed motion in this case. Accordingly, he may not raise the point on appeal. Defendant argues, however, that a renewed motion would have been “futile” given the court’s earlier rulings on unspecified “voir dire and evidentiary objections,” but he fails to explain why these rulings reflected the court’s attitude toward severance.
Defendant also argues the court had a sua sponte duty to sever once grounds for severance developed. (See People v. Patino (1979) 95 Cal.App.3d 11, 33 [156 Cal.Rptr. 815] [sua sponte obligation to sever joint trial when “circumstances” require it].) He suggests the court abused its discretion and violated his federal due process and Eighth Amendment rights *69 by failing to sever the cases. The point lacks merit. We have held that, in light of the statutory preference for joint trials (see § 1098), severance remains largely within the trial court’s discretion. (People v. Bradford (1997) 15 Cal.4th 1229, 1314-1315 [65 Cal.Rptr.2d 145, 939 P.2d 259]; People v. Hardy (1992) 2 Cal.4th 86, 167 [5 Cal.Rptr.2d 796, 825 P.2d 781]; see People v. Mitcham (1992) 1 Cal.4th 1027, 1049 [5 Cal.Rptr.2d 230, 824 P.2d 1277] [no exceptional circumstances]; People v. Roberts (1992) 2 Cal.4th 271, 328 [6 Cal.Rptr.2d 276, 826 P.2d 274] [penalty phase].) Nonetheless, we have also stated that a reviewing court may reverse a conviction when, because of consolidation, “ ‘gross unfairness’ ” has deprived the defendant of a fair trial. (People v. Pinholster, supra, 1 Cal.4th at p. 933.) The record in the present case, however, fails to show that the jurors in this joint trial were unable or unwilling to assess independently the respective culpability of each codefendant or were confused by the limiting instructions. Indeed, their verdicts (imposing death for McDonald and defendant, but life without parole for Robinson) indicate the contrary was true. Defendant points to no “ ‘gross unfairness’ ” {ibid.) resulting from the trial court’s failure to sever. He merely cites “the possibility of juror confusion.” We find no abuse of discretion, denial of due process, or other error in the court’s ruling denying severance, or in its subsequent failure to order severance sua sponte.
B. Exclusion of Prospective Jurors
Defendant next contends that several prospective jurors were improperly excused because they expressed inability to render a death verdict against codefendant McDonald. In each case, the prosecutor outlined the general charges against the three codefendants, observing that McDonald had no prior criminal record and was charged with hiring his ex-wife’s actual killers, defendant and Robinson. In each instance, the trial court found, based on the prospective jurors’ demeanor and voir dire responses, that their views would prevent or substantially impair their ability to be neutral and follow the court’s instructions. (See Wainwright v. Witt (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) Because prospective jurors frequently give “halting, equivocal, or even conflicting” voir dire responses in capital cases, we usually defer to the trial court’s evaluation of their states of mind and qualifications to serve. (People v. Fudge (1994) 7 Cal.4th 1075, 1094 [31 Cal.Rptr.2d 321, 875 P.2d 36].)
Defendant argues that the prosecutor erred in framing his voir dire examination by outlining or previewing the actual case to be tried, disclosing facts about McDonald’s lack of criminal record and nonparticipation in the actual killing, and concealing or “whitewashing” aggravating facts about McDonald later used against him at the penalty phase. Defendant relies, in *70 part, on authorities suggesting that prospective jurors may not be excluded under the “automatic vote” rule of Witherspoon v. Illinois (1968) 391 U.S. 510, 522, footnote 21 [88 S.Ct. 1770, 1777, 20 L.Ed.2d 776], merely because they expressed an inability to vote for death under the facts in the case before them. (See People v. Fields (1983) 35 Cal.3d 329, 358, fn. 13 [197 Cal.Rptr. 803, 673 P.2d 680].) As we observed in People v. Clark (1990) 50 Cal.3d 583 [268 Cal.Rptr. 399, 789 P.2d 127], under Fields, “excusing a juror for cause because he would vote against the death penalty based on evidence to be presented would violate Witherspoon,” presumably because that vote would not constitute an automatic vote against death regardless of the facts in the case. (People v. Clark, supra, 50 Cal.3d at p. 597, fn. 4; see also People v. Fudge, supra, 7 Cal.4th at pp. 1094-1095.)
As previously indicated, Witherspoon's “automatic vote” test has been replaced by a different formulation asking whether the prospective jurors’ views on capital punishment would prevent or substantially impair the performance of their duties as jurors. (Wainwright v. Witt, supra, 469 U.S. at p. 424 [105 S.Ct. at p. 852].) Exposing prospective jurors to the general facts surrounding the case will not inevitably preclude their disqualification under that formulation. As we stated in People v. Kirkpatrick (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248], “A prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is therefore subject to challenge for cause, whether or not the circumstance that would be determinative for that juror has been alleged in the charging document. [Citations.]”
Thus, we have recently indicated that the court properly may exclude prospective jurors who have expressed an inability to impose the death penalty in any felony-murder case. (See People v. Pinholster, supra, 1 Cal.4th at pp. 916-917.) As we stated in Pinholster, “Each juror’s reluctance to impose the death penalty was based not on an evaluation of the particular facts of the case, but on an abstract inability to impose the death penalty in a felony-murder case.” (Id. at p. 916; see also People v. Barnett (1998) 17 Cal.4th 1044, 1114 [74 Cal.Rptr.2d 121, 954 P.2d 384] [exclusion proper for prospective jurors unable to consider all sentencing alternatives, including death].) Pinholster reached its conclusion even though the trial court had permitted the prosecutor to question the prospective jurors regarding their attitudes toward the specific facts of the case. (People v. Pinholster, supra, 1 Cal.4th at p. 918.)
Pinholster controls here. The record in this case discloses that each of the prospective jurors in question expressed a similar abstract inability to *71 impose death on the hirer in a murder-for-hire case. Paraphrasing Pinholster, supra, 1 Cal.4th at page 917, the people of the State of California have determined that murder for hire is a category of crime for which a defendant may be subject to death, depending on the circumstances. We should defer to the trial court’s finding, based on their voir dire responses, that the prospective jurors at issue here were unable to follow the law in this respect. (See People v. Fudge, supra, 7 Cal.4th at p. 1094.) Accordingly, the exclusions were proper under Wainwright and Pinholster. We note that none of the foregoing authorities suggest that, for voir dire purposes, the prosecutor must disclose all facts, aggravating or otherwise, that comprise the People’s case.
In any event, it seems doubtful defendant could demonstrate he was prejudiced by the exclusion of prospective jurors who indicated they could not impose the death penalty on a person such as McDonald but expressed no difficulty with a death sentence for actual killers such as defendant or Robinson.
C. Denial of Challenges for Cause
Defendant next asserts the court erred in failing to excuse for cause nine prospective jurors who either were predisposed to a death verdict, or expressed reservations about applying the presumption of innocence to a nontestifying defendant. Defendant and his codefendants exercised peremptory challenges to exclude six of these prospective jurors, but defendant failed to exhaust his available challenges to exclude the remaining ones. Under settled law, his failure to exhaust peremptory challenges or to justify his omission bars defendant from claiming that his challenges for cause were improperly denied. (E.g., People v. Fairbank (1997) 16 Cal.4th 1223, 1238 [69 Cal.Rptr.2d 784, 947 P.2d 1321]; People v. Danielson (1992) 3 Cal.4th 691, 713-714 [13 Cal.Rptr.2d 1, 838 P.2d 729].)
Defendant claims he reserved three peremptory challenges for tactical reasons, fearing the eventual seating of even more objectionable prospective jurors. (See People v. Danielson, supra, 3 Cal.4th at pp. 713-714; People v. Box (1984) 152 Cal.App.3d 461, 464-466 [199 Cal.Rptr. 532].) But defendant’s counsel implicitly accepted the jury as constituted by passing without using his remaining challenges or requesting additional ones. Accordingly, defendant waived his right to complain about the court’s failure to excuse any remaining prospective jurors for cause. (See People v. Danielson, supra, 3 Cal.4th at p. 714; see also People v. Fairbank, supra, 16 Cal.4th at p. 1239 [rejecting similar “after-the-fact justifications” for failing to exhaust peremptory challenges].)
*72 In any event, we have reviewed the record, and it supports the court’s rulings as to each of the three prospective jurors left unexcused by peremptory challenges. Although these persons stated either that they distrusted defendants who elected not to take the witness stand to testify, or that they were predisposed to impose death for murders for hire, they eventually affirmed their ability to follow the law and give defendant a fair trial. We should defer to the trial court’s finding, based on their voir dire responses, that these three prospective jurors were able to follow the law in this respect. (See People v. Fudge, supra, 7 Cal.4th at p. 1094.)
D. Preliminary Jury Screening Procedure
Defendant asserts the court erred in allowing the prosecutor and defense counsel to screen out, by stipulation, and outside defendant’s presence, more than 600 prospective jurors whose questionnaires showed they were probably subject to challenge and excusal. The court initially set a goal of 129 death-qualified prospective jurors before final random selection and peremptory challenges. With the agreement of all counsel, and to avoid further lengthy delays during the jury selection process, the court developed a screening procedure that allowed counsel jointly to review the questionnaires and by stipulation to screen out the “strong candidates” for excusal, i.e., those whose questionnaire answers clearly showed they (1) would automatically vote for death, (2) would never vote for death, or (3) suffered a financial or physical hardship preventing jury service. Under the agreement approved by the court, these persons then could be excused without conducting any individual voir dire examination.
The record indicates that although the court initially reviewed the excused prospective jurors’ questionnaires, it ultimately left counsel to stipulate as to particular excusais. The record also indicates that defendant was not personally present when counsel discussed the questionnaires.
Defendant first contends the excusal procedure tended to produce a “pro-death” jury because it allowed counsel to stipulate to excuse prospective jurors based on vague or conflicting questionnaire responses, without conducting the usual probing voir dire needed to accurately “death qualify” a jury. According to defendant, the stipulated procedure resulted in excusing at least 150 prospective jurors whose questionnaire responses were insufficient to justify their exclusion under Wainwright v. Witt, supra, 469 U.S. at page 424 [105 S.Ct. at page 852].
Defendant also argues that the questionnaires were inadequate bases for excusing prospective jurors because of hardship, and that an examination of *73 the individual questionnaires shows that many of these persons were excused without meeting any of the “death views” or hardship criteria of the stipulated agreement. Further, defendant suggests the trial court “abdicated its responsibility” and violated statutory procedures (see Code Civ. Proc., §§ 223, 230) and “analogous federal standards” by delegating to counsel the task of screening out possibly biased or “hardshipped” prospective jurors.
Finally, defendant argues that the procedure employed for excusing prospective jurors took place outside his presence, violating his statutory and constitutional right to be personally present at all “critical stages” of the proceedings unless he has executed a written waiver of that right. (See §§ 977, subd. (b), 1043; Cal. Const., art. I, § 15; cf. Gomez v. United States (1989) 490 U.S. 858, 872 [109 S.Ct. 2237, 2246, 104 L.Ed.2d 923] [voir dire is critical stage of criminal proceeding].)
None of these arguments have merit. The Attorney General first observes that defendant, through his counsel, stipulated to every aspect of the challenged procedure and further agreed to excuse every prospective juror he now asserts was improperly excused. Accordingly, defendant is barred from raising on appeal defects in the procedure in which he acquiesced. (See, e.g., People v. Cudjo (1993) 6 Cal.4th 585, 627-628 [25 Cal.Rptr.2d 390, 863 P.2d 635] [waiver of defects in death-qualifying voir dire]; People v. Visciotti (1992) 2 Cal.4th 1, 38, 41-42 [5 Cal.Rptr.2d 495, 825 P.2d 388] [acquiescence in capital case jury selection procedure]; People v. Mickey (1991) 54 Cal.3d 612, 664-665 [286 Cal.Rptr. 801, 818 P.2d 84] [waiver of defects in personal hardship excusal procedures].) As we stated in Visciotti, “counsel acquiesced in the [voir dire] procedure of which defendant now complains. . . . [¶] . . . [¶] . . . While the parties are not free to waive, and the court is not free to forego, compliance with the statutory procedures which are designed to further the policy of random selection, equally important policies mandate that criminal convictions not be overturned on the basis of irregularities in jury selection to which the defendant did not object or in which he has acquiesced. [Citations.]” (People v. Visciotti, supra, 2 Cal.4th at pp. 37-38; see also Cal. Const., art. VI, § 13 [no reversal for procedural errors absent a “miscarriage of justice”].)
The Attorney General also notes that the stipulated procedure benefited all parties by screening out overzealous “pro-death” as well as “pro-life” venirepersons, and by substantially expediting the jury selection process, “culling out” prospective jurors who probably would have been unable to serve as jurors in any event. We also observe that, once the preliminary screening process had concluded, the court and counsel then conducted the usual voir dire examination of the remaining prospective jurors in selecting the actual jurors who would serve on defendant’s jury.
*74 As for defendant’s absence during a preliminary portion of the jury selection process, and his failure to execute a written waiver of his presence, we have held that generally “the accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him, and the burden is upon him to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial. [Citation.]” (People v. Beardslee (1991) 53 Cal.3d 68, 103 [279 Cal.Rptr. 276, 806 P.2d 1311].) Defendant’s presence at counsels’ jury screening discussions at issue here would have served little purpose. (Ibid.; see People v. Bradford, supra, 15 Cal.4th at p. 1357; People v. Holt (1997) 15 Cal.4th 619, 706-707 [63 Cal.Rptr.2d 782, 937 P.2d 213]; People v. Carpenter (1997) 15 Cal.4th 312, 377-378 [63 Cal.Rptr.2d 1, 935 P.2d 708]; People v. Grant (1988) 45 Cal.3d 829, 846 [248 Cal.Rptr. 444, 755 P.2d 894]; but cf. U.S. v. Gordon (D.C. Cir. 1987) 829 F.2d 119, 125-127 [264 App.D.C. 334] [defendant’s absence from entire jury voir dire deemed reversible error].) Moreover, sections 977 and 1043 do not require the defendant’s presence, or a written waiver, unless the standard referred to in Beardslee has been met. (People v. Bradford, supra, 15 Cal.4th at p. 1357.)
E. Prosecutor’s Peremptory Challenges
The prosecutor used nine of his 15 exercised peremptory challenges to excuse African-American prospective jurors. Defendant made a Batson/Wheeler motion (Batson v. Kentucky (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69]; People v. Wheeler (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]), asserting the prosecutor was improperly using peremptory challenges to exclude African-Americans from the jury. The trial court, without expressly finding that defendant had stated a prima facie case of improper discrimination under these cases, permitted the prosecutor to explain his reasons for each exclusion. After hearing the prosecutor’s explanations and defense counsel’s responses, the court denied defendant’s motion, expressly finding that the prosecutor’s explanations were “reasonably specific and neutral” and sufficiently related to the case, and that defendant demonstrated no prosecutorial “group bias.”
Defendant’s actual jury included only one African-American juror and one African-American alternate juror. Defendant now contends the trial court erred in denying his Batson/Wheeler motion. We find no error.
As we recently stated, we review a trial court’s determination regarding the sufficiency of a prosecutor’s justifications for exercising peremptory challenges “with great restraint. The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific, race- or *75 group-neutral explanation related to the particular case being tried. (People v. Fuentes [(1991)] 54 Cal.3d 707, 718 [286 Cal.Rptr. 792, 818 P.2d 75]; People v. Johnson [(1989)] 47 Cal.3d 1194, 1216 [255 Cal.Rptr. 569, 767 P.2d 1047]; People v. Hall (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854]; see Batson v. Kentucky (1986) 476 U.S. 79, 97-98, & fn. 20 [90 L.Ed.2d 69, 88-89, 106 S.Ct. 1712].) The justification need not support a challenge for cause, and even a ‘trivial’ reason, if genuine and neutral, will suffice. (People v. Montiel [(1993)] 5 Cal.4th 877, 910, fn. 9 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; Johnson, supra, 47 Cal.3d at p. 1218.) [¶] ‘If the trial court makes a “sincere and reasoned effort” to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. . . .’ [Citation.]” (People v. Arias (1996) 13 Cal.4th 92, 136 [51 Cal.Rptr.2d 770, 913 P.2d 980]; see also People v. Williams (1997) 16 Cal.4th 153, 188-189 [66 Cal.Rptr.2d 123, 940 P.2d 710] [upholding prosecutor’s explanation that he had made “mistake” in challenging African-American prospective juror]; People v. Johnson, supra, 47 Cal.3d 1194, 1216-1222 [255 Cal.Rptr. 569, 767 P.2d 1047]; Tolbert v. Page (9th Cir. 1999) 182 F.3d 677, 683-685.) The determination whether substantial evidence exists to support the prosecutor’s assertion of a nondiscriminatory purpose is a “purely factual question.” (People v. Alvarez (1996) 14 Cal.4th 155, 197 [58 Cal.Rptr.2d 385, 926 P.2d 365].)
Initially, we observe that, although the trial court failed to find expressly that defendant had presented a prima facie case of improper group discrimination, and indeed expressed doubts such a showing had been made as to six specific prospective jurors, that finding was probably implicit in the court’s remarks regarding three other excluded African-Americans and in its invitation to the prosecutor to state his reasons for each of his challenges. (See People v. Arias, supra, 13 Cal.4th at p. 135; People v. Fuentes, supra, 54 Cal.3d 707, 716-717, & fn. 5 [286 Cal.Rptr. 792, 818 P.2d 75].)
As the trial court ruled, the prosecutor expressed reasonably specific and neutral reasons, although not particularly logical or substantial ones, for excusing each prospective juror. For example, regarding the three excusals on which the trial court focused, the prosecutor observed that (1) the defense accepted Roslyn R. without asking her a single question, drawing the prosecutor’s suspicions regarding her neutrality; (2) Caroline M. was nervous and shaking during her interrogation, indicating the possibility she might be taking drugs; also, her occupation as juvenile counselor with a belief in rehabilitation might induce her to reject the death penalty; and (3) Eloise K. was a Bible college student who, at one point in her voir dire examination, indicated reluctance to impose the death penalty.
Defendant disputes the sufficiency of these explanations and likewise questions the adequacy or plausibility of the prosecutor’s responses regarding several other excluded prospective jurors, including (1) Alfred H., whom *76 the prosecutor characterized as “an NRA member” with a “deeply religious bent,” not likely to favor the death penalty; (2) JoAnn W., who also supposedly also had a “religious bent” that might preclude her favoring the death penalty; (3) Lionel J., who had a “drug history” and was “weak” on the death penalty; (4) Lisa K., who the prosecutor believed was too young (age 25) and who seemed too sympathetic to defendant McDonald; and (5) James T., also too young (age 21) and appearing too eager to remain on the jury despite both holding a job and attending classes.
Although defendant asserts that the prosecution’s reasons for excluding these persons were inadequate, a sham, or unsupported by the record, nevertheless, as we previously explained, if the trial court makes a “ ‘ “sincere and reasoned effort” ’ ” to evaluate the nondiscriminatory justifications the prosecutor offers, the court’s conclusions are entitled to deference on appeal if supported by substantial evidence. (People v. Arias, supra, 13 Cal.4th at p. 136.) Our examination of the record convinces us the court made such an effort.
Defendant contends the prosecutor improperly excused prospective jurors Alfred H., JoAnn W., and Eloise K. based on a “blanket characterization regarding religious persons” amounting to invidious discrimination. To the contrary, as the prosecutor explained, he excused these persons because he perceived they had a “religious bent” or bias that would make it difficult for them to impose the death penalty, a proper, nondiscriminatory ground for making a peremptory challenge. (See, e.g., People v. Jones (1997) 15 Cal.4th 119, 164-165 [61 Cal.Rptr.2d 386, 931 P.2d 960]; People v. Pride (1992) 3 Cal.4th 195, 230 [10 Cal.Rptr.2d 636, 833 P.2d 643].)
Defendant, citing cases from other jurisdictions employing a “comparative analysis” approach, maintains that several of the prosecutor’s explanations for excusing African-Americans were inconsistent with his actions in accepting various non-African-Americans who gave similar voir dire responses as prospective jurors. The rule is clear in this state, however, that in evaluating the sufficiency of the prosecutor’s explanations, a reviewing court will not engage in such a comparative analysis regarding persons the prosecutor accepted. (People v. Jones, supra, 15 Cal.4th at p. 162; People v. Arias, supra, 13 Cal.4th at p. 136, fn. 16; People v. Johnson, supra, 47 Cal.3d at p. 1221.) We see no compelling reason to reconsider those holdings here.
Defendant also complains that the trial court “supplemented” the prosecutor’s explanations regarding several other excused prospective jurors with additional justifications drawn from their voir dire testimony. (See People v. Fuentes, supra, 54 Cal.3d at p. 720 [prosecutor’s explanations must *77 be found to have “actually prompted” exercise of peremptory challenge].) We agree with defendant that ordinarily the court should not attempt to bolster a prosecutor’s legally insufficient reasons with new or additional factors drawn from the record, but we are not convinced the prosecutor’s stated reasons in this case were legally insufficient.
Even seemingly “ ‘highly speculative’ ” or “ ‘trivial’ ” grounds may support the exercise of a peremptory challenge. (People v. Williams, supra, 16 Cal.4th at p. 191; People v. Johnson, supra, 47 Cal.3d at p. 1218; see Purkett v. Elem (1995) 514 U.S. 765, 768 [115 S.Ct. 1769, 1771, 131 L.Ed.2d 834].) As we stated in Johnson, “What is required are reasonably specific and neutral explanations that are related to the particular case being tried.” (People v. Johnson, supra, 47 Cal.3d at p. 1218.) Here, the trial judge saw and heard the entire voir dire proceedings and found the prosecutor made no improper use of peremptory challenges. As in Johnson, “Under these circumstances we see no good reason to second-guess his factual determination.” (Id. at p. 1221, fn. omitted.) In sum, as we noted in People v. Williams, supra, 16 Cal.4th at page 190, “The trial judge’s findings . . . , largely turning on evaluations of credibility, are entitled to great deference. [Citations.]”
F. Failure to Voir Dire Jurors Regarding News Article
Defendant next contends the trial court erred in failing to examine the jurors regarding an Oakland Tribune news article discussing the cost of his trial. This article, appearing on the morning final jury selection began, informed readers that the jury selection process had already extended for eight months at a cost ranging from $600,000 to $750,000, that the slow pace of trial was attributable to trial Judge Sarkisian, that additionally the six defense attorneys for the three codefendants were paid $500,000, and that the cost of trial was reportedly “devastating” to the court’s budget. The prosecutor was quoted as saying that defense counsel already had been paid more for this case than his annual salary.
Defendant’s counsel informed the court of the article and asked for a mistrial or at least additional voir dire to determine if any juror had read it. Counsel for the codefendants declined to join the request. The court, observing that the jurors had been admonished not to read such articles, and that this article contained no prejudicial material, denied the request and gave no further admonition.
Defendant argues that the court abused its discretion in failing to take further steps to assure defendant a fair trial. We find no abuse of discretion. In the absence of proof of specific juror misconduct, we may assume that the *78 jury heeded the court’s initial admonition and avoided any news media accounts of the trial. (See People v. Dennis (1998) 17 Cal.4th 468, 542, fn. 17 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; People v. Lambright (1964) 61 Cal.2d 482, 486-487 [39 Cal.Rptr. 209, 393 P.2d 409].) In any event, we agree with the trial court that the article contained no prejudicial or inflammatory material.
G. Incompetent Counsel Claim
Defendant asserts that counsel was incompetent in several respects during the pretrial or jury selection phase of trial. We find these claims meritless.
1. Failing to Object to Fact-specific Voir Dire
Defendant contends his counsel lacked tactical reasons for failing to object to the prosecutor’s voir dire questions, which broadly outlined or previewed the actual case to be tried, including facts about McDonald’s lack of criminal record and nonparticipation in the actual killing. As we previously observed (ante, at pp. 69-71), the trial court did not abuse its broad discretion in allowing the prosecutor to pose these questions. Moreover, defense counsel may well have had tactical reasons for declining to object to questioning aimed at excusing jurors who had reservations about imposing the death penalty on McDonald, but expressed no similar reservations about defendant. (See ante, at p. 71.)
2. Agreeing to Preliminary Jury Screening Procedure
Defendant also asserts counsel was incompetent in agreeing to the preliminary screening procedure whereby, outside defendant’s presence, the prosecutor and counsel reviewed the jury questionnaires and by stipulation screened out the “strong candidates” for excusal. We find no incompetence here. Defense counsel may well have had tactical reasons for avoiding the lengthy delays usually involved in capital case voir dire. As we previously stated (ante, at pp. 73-74), the procedure benefited all parties by substantially expediting the jury selection process and “culling out” prospective jurors who probably would have been unable to serve. Defendant’s presence at the jury screening discussions would have served little tactical purpose.
3. Failure to Move Adequately to Sever the Trial
Defendant argues his counsel failed to make an adequate presentation when joining codefendant Robinson’s motion to sever the trial, and also failed to move for separate juries. Defendant cites various additional items of *79 evidence that could have been included in these motions, primarily facts showing (1) the differing cultural and economic backgrounds of McDonald and his codefendants, and (2) the differing attitudes of various prospective jurors regarding these defendants. As we have previously observed (ante, at p. 69), the record in the present case, however, fails to show that the jurors in this joint trial were unable or unwilling to assess independently the respective culpability of each codefendant or were confused by the limiting instructions. Indeed, their verdicts (imposing death for McDonald and defendant, but life without parole for Robinson) indicate the contrary was true. Defendant points to no gross unfairness resulting from the trial court’s failure to sever. We find no abuse of discretion in that ruling. Accordingly, defendant was not prejudiced by defense counsel’s supposed omissions or inadequacies in pursuing the motion to sever.
III. Guilt Phase Issues
A. Testimony of Armond Jack
Defendant maintains that admission of prosecution witness Armond Jack’s perjured testimony, under an immunity agreement covering Jack’s alleged perjury at defendant’s trial, violated his state and federal due process and confrontation rights, as well as his right to a capital trial conducted with reliable and admissible evidence. The point lacks merit. As we explain, the immunity agreement at issue should be construed to apply only to Jack’s prior acts of perjury, as disclosed by his present testimony. It did not permit him the option of committing future perjury during defendant’s trial. Assuming the agreement was ambiguous in this regard, defendant failed to object or seek clarification. (See, e.g., People v. Williams (1997) 16 Cal.4th 635, 661 [66 Cal.Rptr.2d 573, 941 P.2d 752]; Evid. Code, § 353.) In any event, defendant has failed to show he was prejudiced by the extended grant of immunity.
As previously indicated, Jack was initially granted immunity from prosecution for any acts or testimony arising from his trial testimony concerning the roles of defendant, Robinson, or Robert McDonald in Carlene McDonald’s death. After receiving this immunity, Jack testified he was present when Robert Louisville advised him and defendant that Louisville knew a man who would pay to have his ex-wife killed. Jack accompanied defendant and Louisville when they searched for Carlene’s residence, and he described their visit with Robert McDonald, who told defendant he would pay $2,500 for Carlene’s murder. Jack also testified he was present the next day when defendant and Robinson unsuccessfully searched for Carlene’s car in a BART parking lot. According to Jack, after this search, the men drove back *80 to Carlene’s apartment. Defendant asked for a knife, and Robinson gave him one resembling a 13-inch kitchen knife already placed in evidence. Jack left the men at Carlene’s apartment and drove away. When he saw them again the next day, Jack asked defendant whether “he did it,” and defendant replied, “Yeah.” At Robinson’s apartment, defendant gave Jack $500 of the $2,500 he had received from Robert McDonald. Sometime later, McDonald gave defendant an additional $1,700, of which Jack received $800.
Following this testimony implicating defendant, and on cross-examination, Jack admitted lying at Robinson’s preliminary examination when he testified that he neither saw, nor heard any discussion concerning, any knives during the trip to Carlene’s house. Believing Jack’s immunity would not extend to perjury at a former proceeding, the court held a hearing to decide whether Jack should be provided counsel. The prosecutor, however, agreed that Jack would not be prosecuted “based on any testimony he gives, has given here, or any testimony he’s given at any prior proceedings,” and Jack’s cross-examination continued. Defendant failed to object or seek clarification of the prosecutor’s agreement to extend the original grant of immunity, although he joined in a request to inform the jury that Jack had been granted immunity for perjury.
In his cross-examination, Jack admitted making various false statements during Robinson’s or his codefendants’ preliminary examinations, and in his statements to police officers and codefendants’ investigators. These misstatements included (1) failing to tell police about receiving his share of the money from McDonald; (2) lying about being at or near Carlene McDonald’s apartment; (3) falsely stating that he did not see any of the codefendants with a knife, extension cord, or pellet gun; and (4) lying about hearing defendant say that he was going to kill a woman. According to Jack, he made most of these misstatements to “cover” himself, and because he did not trust the officers and district attorney who were interrogating him.
Defendant suggests that Jack also admitted perjuring himself at defendant’s trial by lying about seeing Robinson pass a knife to defendant, but our reading of the testimony in question indicates Jack merely denied seeing the knife in defendant’s possession when he dropped defendant off at Carlene McDonald’s apartment.
Following Jack’s testimony, defendant moved for a mistrial, citing Jack’s admission of false statements and inconsistencies with his prior testimony, but again defendant failed to object to, or seek clarification of, the extended immunity agreement itself. The court denied the mistrial motion after agreeing that defendants could inform the jury at close of trial regarding the *81 prosecutor’s stipulation that Jack would not be prosecuted for perjury based on his past or present testimony. The court later so advised the jury.
Defendant now argues that this stipulation was invalid under section 1324, which permits grants of immunity to secure testimony, but withholds immunity from prosecution for perjury committed in giving that testimony. As defendant observes, the purpose of section 1324 is “to secure truthful testimony, not to license perjury.” (People v. Hathcock (1971) 17 Cal.App.3d 646, 649 [95 Cal.Rptr. 221].) In defendant’s view, the prosecutor abused his power, and violated defendant’s due process and confrontation rights, and his right to be tried with reliable evidence, by granting Jack “a blanket grant of immunity for perjury.” Defendant asserts that the court erred in admitting Jack’s testimony, and in failing to instruct the jury to disregard it. (Defendant also contends, without further analysis, that the court improperly restricted his cross-examination of Jack, thereby infringing on his due process and confrontation rights. Our review of the record indicates no such infringement took place. The court properly sustained the prosecutor’s objections on the grounds defense counsel’s questions were argumentative or lacked foundation.)
As the Attorney General points out, the prosecutor’s extended grant of immunity reasonably should be construed as applying only to Jack’s past perjury, rather than immunizing him for future perjury committed at defendant’s trial. Defendant acknowledges case law indicating that section 1324 would not bar immunity for past acts of perjury. (See People v. Garner (1989) 207 Cal.App.3d 935, 941 [255 Cal.Rptr. 257]; People v. Baker (1978) 88 Cal.App.3d 115, 123-124 [151 Cal.Rptr. 362].) Although the court described the stipulation to the jury as immunizing Jack for any perjury “based upon any testimony given at this trial” or in prior proceedings, the parties’ intent could have been simply to protect Jack from perjury charges brought to light by (i.e., “based upon”) his present trial testimony. This interpretation of the prosecutor’s stipulation is supported by the record, as the stipulation was made after Jack admitted lying at an earlier proceeding and should be construed in that context. Accordingly, we need not address defendant’s contention that the prosecutor’s grant of immunity for future perjury was illegal and constituted a denial of due process, confrontation, and “reliable evidence” rights.
Assuming the extended immunity agreement was ambiguous in its possible application to Jack’s trial testimony, defendant failed to object to or seek clarification of the prosecutor’s extended grant of immunity to Jack once the inconsistencies in his testimony became apparent. Defense counsel protested the allegedly perjured testimony itself and moved to strike it, but *82 he raised no question regarding the propriety of extending Jack’s grant of immunity to include his perjured testimony. (Cf. Wolff v. United States (10th Cir. 1984) 737 F.2d 877, 879 [failure to object to ambiguous grant of immunity waived claim on appeal].)
Finally, as the Attorney General observes, defendant fails to show he was prejudiced by either the extended grant of immunity or by any specific acts of perjury Jack supposedly committed. Jack had already substantially implicated defendant before the extended immunity was granted, so the grant probably could not have contributed to the verdict. In addition, the defense extensively cross-examined Jack, fully exploited the various inconsistencies in his testimony, and argued that the jury should disbelieve him because he had been given immunity for perjury. The jurors were made well aware that, for a variety of reasons, they could not give Jack’s present testimony much credit.
For all the foregoing reasons, we conclude the court did not commit prejudicial error in allowing the extended grant of immunity.
B. Prior Statement of David Willis
At trial, the prosecutor was permitted to introduce, as a prior inconsistent statement, the tape-recorded statement of David Willis implicating defendant in the murder of Carlene McDonald. In his statement, Willis asserted that, on the night of the murder, defendant admitted killing a woman and showed Carlene’s driver’s license, watch, and ring to Willis. The next morning, according to Willis, defendant also admitted stabbing Carlene while Robinson held her.
At trial, Willis denied knowledge of the matters described in his statement and denied the truth of his assertions regarding defendant’s admissions. Willis claimed he had been “coached” by the investigating officer, Sergeant Weaver, who promised to dismiss pending burglary charges against Willis in return for his statement implicating defendant. Sergeant Weaver, on the other hand, denied making any promises of leniency or threats of prosecution, and stated that Willis indicated that his willingness to talk was based on his recent religious conversion.
Defendant now asserts that Willis’s recorded statement was coerced by Sergeant Weaver’s improper promise of leniency or threat of prosecution. Initially, we observe that defendant failed to object to the admission of Willis’s statement at trial. Accordingly, he has waived the point for appeal. (See, e.g., People v. Williams, supra, 16 Cal.4th at p. 661; Evid. Code, § 353.)
*83 Moreover, as we have seen, the evidence was conflicting on the question whether Weaver made any promises to Willis and, despite defendant’s entreaty, we have no sound basis for rejecting Weaver’s testimony that he made none. Although Weaver was uncertain about some collateral facts, such as the number of times he saw Willis before recording his statement, or his prior knowledge of Willis’s pending burglary charge, his testimony denying he made any promises of leniency to Willis, confirmed in Willis’s recorded statement itself, was not inherently unbelievable or unreliable. (See People v. Barnes (1986) 42 Cal.3d 284, 303-306 [228 Cal.Rptr. 228, 721 P.2d 110].)
Additionally, as the Attorney General observes, the case law fails to support defendant’s premise that a third party witness’s statements are rendered inadmissible against a defendant if induced by improper offers of leniency. (See People v. Badgett (1995) 10 Cal.4th 330, 354-355 [41 Cal.Rptr.2d 635, 895 P.2d 877]; People v. Daniels (1991) 52 Cal.3d 815, 862-863 [277 Cal.Rptr. 122, 802 P.2d 906].)
Defendant also argues the court erred in failing to instruct the jury sua sponte regarding the effect of coercion on the reliability of a witness’s statement. The court did instruct (CALJIC No. 2.13) that a witness’s prior inconsistent statements may be considered to test the witness’s credibility and also as evidence of the truth of the facts stated. Likewise, the court instructed the jury that it could consider “the existence or nonexistence of a bias, interest or other motive” in evaluating witness testimony. Given the conflicting evidence on the voluntariness of Willis’s statement, no further instructions were required in the absence of a defense request on that subject. (Cf. People v. Underwood (1964) 61 Cal.2d 113, 122-125 [37 Cal.Rptr. 313, 389 P.2d 937] [uncontradicted evidence of coercion warranted sua sponte cautionary instruction on jury’s use of witness’s prior inconsistent statements involuntarily elicited].) As a practical matter, most jurors would realize that promises of leniency or other coercion could induce false statements.
C. Prior Testimony of Gail Johnson
Defendant next contends the court erred in admitting the prior testimony of codefendant Robinson’s girlfriend, Gail Johnson, elicited at Robinson’s preliminary examination. At defendant’s trial, Johnson declined to identify either defendant or Robinson, claiming she had no memory of the events described in her earlier testimony. Following each claim of memory loss, the court allowed the prosecutor to place in evidence her prior testimony on the subject. In that testimony, Johnson stated, inter alia, that *84 Robinson, defendant, and Jack appeared at her home on the evening of November 6, that she found an extension cord for Robinson, that she saw the men leave together, and that when they returned the next day Robinson had a significant sum of money. Johnson also testified that Robinson later admitted being “involved” in a murder for hire, that the scheme involved breaking into a woman’s house to suggest a burglary had occurred, that problems had arisen in disposing of the victim’s body, and that Robinson feared he left his fingerprints on the cord.
Defendant observes that he and his counsel were absent from Robinson’s preliminary examination and, accordingly, had no opportunity to cross-examine Johnson at that time. He argues that, in light of Johnson’s professed lack of memory at his trial, her earlier testimony was not admissible as prior “inconsistent” testimony and, accordingly, its admission violated his confrontation right. (See, e.g., Douglas v. Alabama (1965) 380 U.S. 415, 419-420 [85 S.Ct. 1074, 1077-1078, 13 L.Ed.2d 934]; People v. Newton (1970) 8 Cal.App.3d 359, 385 [87 Cal.Rptr. 394].) Defendant also claims, without substantial analysis, that Johnson’s preliminary examination testimony was “suspect . . . given her testimony regarding police coercion.”
In response, the Attorney General first asserts that defendant waived any objection to the admission of Johnson’s prior testimony by failing to object. The record indeed shows that defense counsel merely refused to stipulate to the accuracy of the transcript recording that testimony, on the ground that defendant was not present at Robinson’s preliminary examination. This refusal to stipulate was not an objection to the admission of the testimony.
In any event, as the Attorney General also observes, in light of Johnson’s apparent evasions and unwillingness to testify against (or even identify) defendant or Robinson at trial, the trial court was justified in admitting her earlier testimony as a prior inconsistent statement. (See Evid. Code, § 1235; People v. Montiel (1993) 5 Cal.4th 877, 930 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; People v. Johnson (1992) 3 Cal.4th 1183, 1219-1220 [14 Cal.Rptr.2d 702, 842 P.2d 1]; People v. Fierro (1991) 1 Cal.4th 173, 221-222 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) As Johnson observes, “Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness’s prior statement describing the event. [Citation.] However, courts do not apply this rule mechanically. ‘Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness’ prior statement [citation], and the same principle governs the case of the forgetful witness.’ [Citation.] When a witness’s claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a reasonable basis in the record for concluding that the *85 witness’s T don’t remember’ statements are evasive and untruthful, admission of his or her prior statements is proper. [Citation.]” (People v. Johnson, supra, 3 Cal.4th at pp. 1219-1220, italics added.)
The record supports the court’s implied finding that witness Johnson’s claimed memory loss was a deliberate evasion. As the Attorney General notes, Johnson stated she recalled none of her preliminary examination testimony and none of the events surrounding the offenses. Indeed, she claimed an inability to identify either defendant or even Robinson, whom she nonetheless acknowledged as the father of her son. Additionally, rather than claim memory loss, Johnson denied certain facts outright, such as whether Robinson told her how the victim’s body was disposed of, whether the codefendants mentioned receiving any money, and whether she saw Robinson with the extension cord. In light of the entire record, we conclude her testimony was properly impeached with her prior recorded testimony.
Moreover, for the reasons given in rejecting similar claims regarding the recorded statement of David Willis (ante, at pp. 82-83), we reject defendant’s contentions that Johnson’s prior testimony was coerced by promises of leniency, and that the court erred in failing to instruct the jury sua sponte regarding the effects of this coercion.
D. Testimony ofZane Sinnott
At trial, Zane Sinnott testified he overheard defendant admit killing a woman with a knife, after using a toy gun to abduct her. Sinnott also testified he heard defendant and Armond Jack discuss their efforts to obtain more money from McDonald. Defendant contends Sinnott’s testimony should have been suppressed, or the entire case against defendant dismissed, as a result of “outrageous governmental conduct” in providing Sinnott benefits in return for his testimony. According to defendant, in return for his testimony, Sinnott was given money for food and lodging ($700) and reduced charges or “pardons” for his own criminal conduct. Defendant characterizes the arrangement as a “license” to commit crimes.
According to the Attorney General, defendant made no objection to Sinnott’s testimony on the ground that undue benefits were provided. Defendant does not dispute this claim, and he has therefore waived the point. Moreover, as the Attorney General observes, current case law permits giving benefits, either financial or in the form of reduced sentences, to witnesses or informants to secure their truthful testimony, provided those benefits are disclosed to the defense for impeachment purposes. Granting benefits, reduced sentences, or even immunity to secure a witness’s testimony is *86 commonplace and would not constitute such “outrageous” conduct as to justify suppression or outright dismissal. (See People v. Badgett, supra, 10 Cal.4th at pp. 354-355; U.S. v. Cervantes-Pacheco (5th Cir. 1987) 826 F.2d 310, 312-316, cert. den. sub nom. Nelson v. United States (1988) 484 U.S. 1026 [108 S.Ct. 749, 98 L.Ed.2d 762]; cf. Boulas v. Superior Court (1986) 188 Cal.App.3d 422, 429, 435 [233 Cal.Rptr. 487] [prosecutorial interference with defendant’s right to counsel warrants dismissal].)
In a supplemental brief, defendant had cited the decision in U.S. v. Singleton (10th Cir. 1998) 144 F.3d 1343, holding that granting leniency to a witness in exchange for testimony violated a federal statute prohibiting giving compensation or value for evidence. Defendant, however, has withdrawn this aspect of his argument. As he now acknowledges, the court of appeals ordered a rehearing in bank within days of the original decision and has ruled in U.S. v. Singleton (10th Cir. 1999) 165 F.3d 1297, “that Congress did not intend the federal statute to invade the well-established prerogative of the sovereign to offer leniency in exchange for a witness’s testimony.” (People v. Maldonado (1999) 72 Cal.App.4th 588, 595, fn. 3 [84 Cal.Rptr.2d 898]; see also U.S. v. Condon (7th Cir. 1999) 170 F.3d 687, 689-690.) The United States Supreme Court denied certiorari in Singleton (Singleton v. United States (1999) 527 U.S. 1024 [119 S.Ct. 2371, 144 L.Ed.2d 775]). Accordingly, we will follow the rule confirmed by the Singleton in bank panel and other authorities previously cited.
Defendant’s supplemental brief also cites section 132.5, subdivision (b), forbidding witnesses to an event from accepting money or its equivalent for providing information regarding the event. We note that the provision does not purport to render inadmissible testimony or information received from an informant in return for benefits provided. Moreover, the section is expressly inapplicable to “[l]awful compensation provided to an informant by a prosecutor or law enforcement agency.” (§ 132.5, subd. (g)(2).) Contrary to defendant’s argument, we cannot assume that dismissal or reduction of charges against informant Sinnott constituted an unlawful plea bargain benefit under section 1192.7, subdivisions (a) and (b). (See Dix v. Superior Court (1991) 53 Cal.3d 442, 465, fn. 18 [279 Cal.Rptr. 834, 807 P.2d 1063].)
Nor do we accept defendant’s theory that by reducing or dismissing various charges against Sinnott, the prosecutor “effectively vouched” for Sinnott’s reliability as a witness, contrary to the rule forbidding prosecutors to express their personal beliefs in the integrity of a witness. (E.g., People v. Stansbury (1993) 4 Cal.4th 1017, 1059 [17 Cal.Rptr.2d 174, 846 P.2d 756].) Granting benefits to secure testimony may indicate the prosecutor’s perceived need for the informant’s testimony, but would not of itself vouch for *87 the reliability or integrity of that testimony. Defendant fails to cite any instances in the record when the prosecutor attempted any such improper vouching.
E. Redacted Statements
Defendant asserts that the court’s refusal to sever the joint trial resulted in admission of an abridged, misleading version of his statement to Sergeant Weaver, redacted or edited in such a way as to exclude defendant’s references to his codefendants and to place undue emphasis on his own role in the murder. Additionally, defendant complains that the court insufficiently edited various of codefendants’ statements or admissions to avoid implicating him. These arguments lack merit.
1. Defendant’s Statement to Sergeant Weaver
Defendant made a statement to Sergeant Weaver implicating himself and Robinson in the kidnapping and murder of Carlene McDonald, but suggesting Robinson did the actual killing. The court found the statement inadmissible at the joint trial because it could not be effectively redacted to avoid references to Robinson. Defendant contends excluding his statement deprived him of exculpatory evidence.
Weaver testified only that defendant told him a toy gun he showed to defendant resembled the one used to force Carlene McDonald into her car when she was abducted. The court excluded the remainder of defendant’s statement to Weaver on the ground its references to codefendant Robinson could not be satisfactorily redacted. Defendant made no objection to the exclusion of this portion of his statement, but he now claims its exclusion created a false picture of his complicity in the murder. (See People v. Douglas (1991) 234 Cal.App.3d 273, 285-287 [285 Cal.Rptr. 609]; People v. Matola (1968) 259 Cal.App.2d 686, 692-693 [66 Cal.Rptr. 610].)
Defendant waived the point by failing to object to exclusion of the entire statement. Moreover, we must bear in mind that the excludéd evidence, which was supposedly favorable to the defense, was set forth in defendant’s own statement to Sergeant Weaver, a statement based on evidence presumably otherwise available to the defense in nonhearsay form. The defense was not foreclosed from implicating Robinson, or anyone else, through direct testimony or other nonhearsay evidence. Defendant’s statement to Weaver, however, was inadmissible hearsay if used to implicate the other codefendants. Additionally, as we have seen, ample evidence of Robinson’s and McDonald’s complicity was introduced at trial. Accordingly, defendant could not have been prejudiced by the exclusion of his statement.
*88 2. Zone Sinnott’s Conversation With McDonald
Defendant next contends the court failed adequately to redact Zane Sinnott’s tape recording of his conversation with McDonald, also implicating defendant. (See, e.g., People v. Fletcher (1996) 13 Cal.4th 451, 455, 460-468 [53 Cal.Rptr.2d 572, 917 P.2d 187], applying the so-called Aranda-Bruton[2] rule.) During these conversations, McDonald made some oblique references to “Turk” as being involved in some undefined way in the scheme to kill Carlene McDonald. Other testimony indicated defendant was sometimes known as Turk, although when Sinnott first met McDonald, he introduced himself by that same name.
As the Attorney General observes, the trial court limited admission of these conversations to the case against McDonald. Moreover, these minor references to someone named Turk could not have prejudiced defendant in light of the other incriminating evidence in the case.
3. Gail Johnson’s Conversation With Robinson
As previously noted (ante, at pp. 83-85), at trial, prosecution witness Gail Johnson declined to identify either defendant or codefendant Robinson. Accordingly, Robinson’s counsel stipulated with the prosecutor to allow introduction of her prior testimony at Robinson’s preliminary examination, including Robinson’s admissions to her, redacted to eliminate references to defendant. Defendant’s counsel refused to join this stipulation. Accordingly, in addition to her other preliminary examination testimony, Johnson testified that Robinson admitted to her that he and other unnamed persons were involved in the murder of Carlene McDonald. (E.g., Johnson testified that “it had got messed up because they were suppose[d] to . . . place the body somewhere else.”)
Defendant now argues that in light of other evidence in the case linking him with Robinson in the murder, the redacted version of Johnson’s testimony was insufficient to assure that he was not inculpated by a nontestifying codefendant’s admission or confession. (See, e.g., People v. Fletcher, supra, 13 Cal.4th at pp. 460-468; People v. Hampton (1999) 73 Cal.App.4th 710, 718-721 [86 Cal.Rptr.2d 665].)
As the Attorney General observes, although defense counsel objected to any references to defendant by name in Johnson’s prior testimony, he failed to object to the redacted testimony or to suggest further editing. Contrary to *89 defendant’s suggestion, such an objection would not have been futile, as the court clearly showed an awareness of the need for careful redaction of a defendant’s statement implicating his codefendants. Accordingly, defendant has waived the point for appeal. Moreover, the unredacted references to Robinson’s possible (unnamed) accomplices were undoubtedly harmless to defendant in light of the other substantial incriminating evidence in the case.
F. Sufficiency of Evidence of First Degree Murder and Financial Gain Special Circumstance
As we have seen, ample evidence connected defendant to the murder for hire of Carlene McDonald, including his own highly incriminating admissions to Armond Jack, Zane Sinnott, and David Willis, and his admission to Sergeant Weaver that he believed he recognized the gun used to force Carlene into her car. Defendant, relying on his previous unsuccessful arguments regarding the inadmissibility of this body of evidence (see ante, pts. III.A.-III.E.), asserts the remaining evidence was insubstantial. His premise fails: All the foregoing evidence was properly admitted against him and clearly supports his conviction.
G. Failure to Instruct Sua Sponte on Mental Disorder
Defendant next argues the court erred in failing to give a sua sponte instruction regarding the effect of a mental disease, defect, or disorder on his ability to deliberate or premeditate the crime. (See CALJIC No. 3.32, formerly CALJIC No. 3.36 (1981 rev.) (4th ed. 1979.).) The court did instruct the jury on the various mental states and specific intents required to establish the various crimes charged, including premeditation and deliberation, explaining that if the evidence regarding an intent or mental state is susceptible of two reasonable interpretations, the jury must adopt the one favorable to the defendant. The court also instructed that if defendant was intoxicated by liquor or drugs at the time of the crime, the jury could consider that fact in determining whether he had the requisite specific intent or mental state, and that if the jury had a reasonable doubt on the matter, it had to find defendant did not have that intent or mental state.
But none of these instructions focused on whether a preexisting mental disorder actually precluded defendant from premeditating or deliberating. Defendant points to testimony by Dr. Fred Rosenthal, a defense psychiatrist, who opined that defendant’s past heavy cocaine and heroin use amounted to a “substance use disorder” that could have “impaired” his ability to reason and make sound judgments and could have resulted in impulsive, erratic behavior. In Dr. Rosenthal’s words, defendant “could not use the kind of *90 judgment that he might have been able to use if he was not so heavily involved in the cocaine and heroin.” Relying on this testimony, defense counsel argued to the jury that defendant’s drug abuse prevented him from being able to premeditate or deliberate.
A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. (People v. Wickersham (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311], disapproved on other grounds in People v. Barton (1995) 12 Cal.4th 186, 200-201 [47 Cal.Rptr.2d 569, 906 P.2d 531].) Defendant argues that, by reason of Dr. Rosenthal’s testimony, the court should have given CALJIC No. 3.32 sua sponte. We disagree.
Dr. Rosenthal did not testify that defendant’s drug use prevented him from premeditating or deliberating, or from forming any other required mental state or specific intent. But the witness did opine that defendant suffered from a substance use disorder that may have clouded his judgment and caused erratic behavior. Defendant argues that, under the case law, this testimony was sufficiently “substantial” (People v. Bacigalupo (1991) 1 Cal.4th 103, 125 [2 Cal.Rptr.2d 335, 820 P.2d 559]) to warrant “mental disorder” instructions in addition to those already given. (See People v. Aguilar (1990) 218 Cal.App.3d 1556, 1568-1569 [267 Cal.Rptr. 879] (Aguilar); People v. Leever (1985) 173 Cal.App.3d 853, 865-866 [219 Cal.Rptr. 581] (Leever).)
In Aguilar, defense doctors in a murder case testified the defendant had paranoid personality traits, which might result in overreaction, excessive response, or impaired judgment. The defendant himself testified he thought the victim was reaching for a knife just before the killing, evidence relevant to whether the defendant premeditated or deliberated his acts. Aguilar held the lower court erred in failing to instruct sua sponte on the effect of the defendant’s mental disorder on his mental state under former CALJIC No. 3.36 (1981 rev.) (4th ed. 1979), now CALJIC No. 3.32. (Aguilar, supra, 218 Cal.App.3d at p. 1569.) Defendant contends that holding is controlling here.
Aguilar preceded our holding in People v. Saille (1991) 54 Cal.3d 1103, 1118-1119 [2 Cal.Rptr.2d 364, 820 P.2d 588] (Saille), to the effect that, with the abolition of the voluntary intoxication/diminished capacity doctrine in 1981 (see § 22), trial courts no longer must give sua sponte instructions regarding the actual effect of the defendant’s voluntary intoxication on his relevant mental state, such as specific intent, premeditation, or deliberation. (See also People v. Castillo (1997) 16 Cal.4th 1009, 1014 [68 Cal.Rptr.2d *91 648, 945 P.2d 1197].) Instead, these instructions are more in the nature of pinpoint instructions required to be given only on request where the evidence supports the defense theory. (Ibid.; Saille, supra, 54 Cal.3d at p. 1119.) By similar reasoning, sua sponte instructions on the actual effect of the defendant’s mental disease or disorder on his relevant mental state became unnecessary with the abolition of the mental disease/diminished capacity doctrine. (§ 28, subd. (a).) To the extent they are contrary to our Saille opinion, Aguilar, supra, 218 Cal.App.3d 1556, and Leever, supra, 173 Cal.App.3d 853, are disapproved.
In any event, any error in failing to instruct under CALJIC No. 3.32 was harmless in light of the other instructions in the case. (See Aguilar, supra, 218 Cal.App.3d at p. 1570; see also Leever, supra, 173 Cal.App.3d at p. 866 [harmless error].) As noted, here the court did instruct the jury that defendant’s drug intoxication at the time of the crime could be considered in determining whether he had the requisite specific intent or mental state. Nothing in this or any other instruction limited the jury’s consideration of defense psychiatric evidence to defendant’s intoxication at the time of the crime, and the jury was free to consider both the long-term and immediate effects of substance abuse on defendant’s formation of the requisite mental state.
In addition, defense counsel in closing argument urged the jury to find that defendant, being “saturated with drugs,” at the time of the murder, lacked the ability to premeditate or deliberate. Although the instruction and argument focused on defendant’s drug intoxication at the time of the crime rather than his history of drug abuse, it is unlikely additional focus on his past abuses would have resulted in a more favorable verdict. We conclude that the court’s instructions, coupled with counsel’s arguments, were sufficient to allow the jury to consider whether defendant’s drug use prevented him from premeditating or deliberating his criminal acts. It was not reasonably probable the jury would have reached a different verdict had the court given CALJIC No. 3.32. (See People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)
H. Prosecutorial Misconduct
Defendant complains of various instances of prosecutor misconduct. (See also post, at pp. 98-101 [penalty phase claims].) We find no prejudicial misconduct occurred here.
1. Armond Jack’s Testimony
Defendant repeats his claim (ante, at pp. 79-82) that prosecution witness Armond Jack’s perjury violated his due process rights, and he *92 blames the prosecutor for failing to ask the court to strike, as “inherently unreliable,” Jack’s testimony that a knife shown to him resembled the one Robinson passed to defendant shortly before Jack dropped them off at Carlene McDonald’s house on the night of her murder.
As the Attorney General observes, at trial defendant failed to charge the prosecutor with misconduct for allowing Jack to testify. Accordingly, he has waived the point. (See, e.g., People v. Musselwhite (1998) 17 Cal.4th 1216, 1253 [74 Cal.Rptr.2d 212, 954 P.2d 475]; People v. Barnett, supra, 17 Cal.4th at p. 1177.) Moreover, we find no misconduct. The inconsistencies in Jack’s testimony, including his earlier failure to mention the knife, were explored at length on cross-examination and were readily apparent to the jury. Under these circumstances, the prosecutor had no obligation to move to strike his own witness’s testimony. Moreover, as we have explained (ante, at p. 82), in light of the other evidence in the case, Jack’s testimony could not have prejudiced defendant.
2. Zane Sinnott’s Testimony
Defendant repeats his accusation that the prosecutor improperly granted Sinnott financial and other benefits to secure his testimony. As we previously observed (ante, at pp. 85-86), granting benefits, reduced sentences, or even immunity to secure a witness’s testimony is commonplace and would not constitute such outrageous conduct as to justify suppression or outright dismissal. Moreover, at trial, the prosecutor revealed the benefits given to Sinnott, and defendant failed to object to Sinnott’s testimony or assert prosecutorial misconduct. Accordingly, defendant waived the claim of misconduct.
3. Reference to Dr. Rosenthal’s Fee
Defendant contends the prosecutor improperly impugned defense expert Dr. Rosenthal by repeatedly commenting that his $2,625 fee was more than defendants Ervin and Robinson received for killing Carlene McDonald. (E.g., “Is his testimony worth more than Carlene’s life? I hardly think so.”)
As the Attorney General observes, defendant failed to object to the supposed misconduct, waiving the point for appeal. Moreover, the prosecutor’s remarks, though arguably unfair to Dr. Rosenthal, were factually accurate and not so disparaging of the witness as to constitute misconduct. (See, e.g., People v. Musselwhite, supra, 17 Cal.4th at p. 1254; People v. Dennis, supra, 17 Cal.4th at pp. 521-522.)
*93 4. Gail Johnson’s Testimony
Defendant argues the prosecutor improperly read into the record witness Johnson’s preliminary examination testimony. As we previously observed (ante, at pp. 83-85), defendant waived the point by failing to object and, in any event, Johnson’s testimony was properly admitted as a prior inconsistent statement. Accordingly, no misconduct occurred here.
5. Argument Outside the Record
Defendant next contends the prosecutor included in his closing argument references to matters outside the record when he argued that defendant told Robinson about the plan to kill Carlene McDonald. The argument was a fair inference drawn from the evidence and, in any event, the prosecutor’s comment was too minor to have prejudiced defendant.
We conclude that the prosecutor committed no prejudicial misconduct in the guilt phase of trial.
I. Incompetent Counsel Claim
Defendant next asserts his trial counsel was incompetent in various respects during the guilt phase. (See also ante, at pp. 78-79 [pretrial and jury selection phase incompetence claims]; post, at p. 101 [penalty phase claims].) We find these claims meritless.
1. Failure to Object to Admission of Gail Johnson’s Prior Testimony
Defendant first contends his counsel was incompetent in failing to object to the admission of Gail Johnson’s prior testimony on Aranda-Bruton confrontation clause grounds. (See ante, at pp. 83-85.) We have concluded, however, that Johnson’s earlier testimony was properly introduced as a prior inconsistent statement. (Ante, at p. 84.) That being so, defense counsel’s failure to object could not have prejudiced defendant.
2. Failure to Object to David Willis’s Statement
Defendant next asserts counsel was incompetent in failing to object to, or to move to strike, David Willis’s recorded statement as the product of improper police inducements. (See ante, at pp. 82-83.) As we previously observed, the statement was properly admitted. (Ibid.)
3. Failure to Object to Redaction of Zane Sinnott’s Statement
Defendant next contends counsel was incompetent in failing to object to the court’s inadequate redaction of Zane Sinnott’s tape recording of *94 McDonald’s statements to him, implicating defendant. (See ante, at p. 88.) As we previously observed, however, the supposed inadequacies could not have prejudiced defendant in light of the other incriminating evidence in the case.
4. Ineffective Cross-examination of Gwyn Willis
Defendant asserts his counsel was ineffective in cross-examining Gwyn Willis, who claimed she overheard defendant and Robinson make incriminating remarks regarding their role in kidnapping Carlene McDonald. Additionally, defense counsel elicited from Ms. Willis the fact, not previously disclosed at trial, that on the night of the murder defendant had a woman’s watch (possibly one belonging to Carlene McDonald), which he was going to give to his girlfriend.
We rarely second-guess counsel’s cross-examination tactics, despite the elicitation of seemingly damaging testimony. (People v. Williams, supra, 16 Cal.4th at p. 217.) Moreover, defendant does not assert the evidence elicited from Ms. Willis was untruthful, nor does he explain how counsel’s cross-examination in these areas could have prejudiced him in light of the other substantial incriminating evidence in the case.
5. Ineffective Cross-examination of D’Mondre Theus
Defendant argues counsel was incompetent in eliciting from D’Mondre Theus the fact, not previously elicited, that he saw a BB gun at David Willis’s apartment on the day after the murder. We reject the argument. Cross-examination is always a risky process—even experienced counsel conducting a brilliant cross-examination might inadvertently elicit damaging disclosures, a risk inherent in the tactical decision to conduct cross-examination. Moreover, the evidence elicited here was cumulative to similar evidence in the case, particularly Willis’s statement, and was not likely to have prejudiced defendant.
6. Failure to Request Instruction on Substance Abuse Disorder
Defendant contends counsel was incompetent in failing to request a special instruction relating his mental disorder defense to the issues of premeditation and deliberation. Dr. Rosenthal testified that defendant was suffering from a substance abuse disorder at the time of the murder. As previously indicated (ante, at pp. 89-91), we reject defendant’s argument the court erred in failing to instruct sua sponte regarding his mental disorder. Similar reasoning defeats defendant’s present claim.
*95 IV. Penalty Phase Issues
A. Failure to Sever Joint Trial
Defendant contends the court erred in failing to sever his penalty phase trial from that of his codefendants. (See also ante, at pp. 68-69.) According to defendant, mitigating evidence elicited in support of codefendants McDonald and Robinson tended to “eclipse” the evidence favorable to him.
After the penalty phase commenced, but before the defendants presented any mitigating evidence, defendant moved to sever his case from McDonald’s because the evidence would show defendant’s role in Carlene’s murder was more direct than McDonald’s role. The court denied the motion. Following penalty phase testimony regarding McDonald’s involvement in sports, music, and religion, and his fundraising and school activities, defendant, joined by Robinson, renewed the motion to sever. The court denied the motion both as untimely and on the merits, stating that the court’s instruction requiring separate penalty determinations should suffice to eliminate possible prejudice resulting from the joint trial. At close of trial, the court instructed the jury to “decide separately the question of the penalty as to each of the defendants.”
Defendant contends that the court’s failure to sever prejudiced his right to the jury’s “individualized consideration” of his character and record in deciding the penalty issue. He argues that under the evidence presented at the joint trial, McDonald was arguably simply an “accomplice” whose culpability in the jury’s eyes was probably greatly overshadowed by defendant’s role as a cold-blooded hired killer. According to defendant, under the evidence, the jury could only compare him unfavorably to McDonald. We note, of course, that the supposed “comparison” failed to benefit McDonald, who also received a death verdict.
Similarly, defendant observes that the jury evidently found Robinson less culpable than it found him, a conclusion supported by its verdict of life imprisonment without possibility of parole for Robinson. Defendant opines that, despite Robinson’s “record of violence,” the jury focused on the facts that defendant planned the murder and Robinson was brought into the scheme at the last minute. Defendant speculates that, had the trials been severed, the jury would have been less likely to compare his culpability with that of his codefendants. Defendant suggests the trial court had reasonable alternatives to a joint trial, including trying his case first so that his jury would not be “tainted” by the mitigating evidence introduced on behalf of the other defendants.
*96 We need not address the Attorney General’s argument that defendant’s motion to sever the penalty trial was untimely, as the court clearly acted within its broad discretion in denying the motion on the merits. As we previously observed (ante, at p. 69) in reviewing defendant’s similar guilt phase contention, in light of the statutory preference for joint trials (see § 1098), severance remains largely within the trial court’s discretion. No abuse appears here.
We see nothing in the record suggesting the jury assigned undue culpability to defendant after hearing his codefendants’ mitigating evidence. Defendant had ample opportunity to present, and did present, testimony and argument regarding his own good character and rehabilitation. The prosecutor made it clear to the jury that McDonald’s role as “mastermind” of his ex-wife’s murder fully justified imposing a death sentence on him. The fact that the jury returned a death verdict for McDonald shows it was not unduly impressed by the array of mitigating evidence introduced on his behalf. Robinson’s lesser verdict can only reflect the jury’s careful consideration of the respective culpability of the three codefendants.
B. Prosecution’s Rebuttal Evidence
Defendant next contends the court erred in allowing the prosecutor to introduce, in the form of rebuttal evidence, defendant’s 10-day suspension of his jail privileges in 1987 and his further infraction for possessing an unlawful alcoholic beverage in 1991. We find no prejudicial error.
This evidence was admitted to rebut defendant’s evidence showing his good conduct in county jail while awaiting trial. Defendant had elicited testimony from an Alameda County jail deputy to the effect that defendant worked efficiently and satisfactorily as an inmate trustee for several months. On rebuttal, and over defense objection, the court permitted the prosecution to introduce jail records indicating defendant suffered a 10-day suspension of jail privileges, without reference to the reason for the suspension.
Additionally, the prosecution called a jail deputy to relate that he found a plastic bag containing “pruno” (a homemade alcoholic beverage) behind defendant’s bunk. The prosecutor later briefly referred to this rebuttal evidence in arguing that defendant posed a possible disciplinary risk if a life sentence were imposed.
Relying on the “satisfactory work performance” testimony he had elicited earlier, defense counsel in surrebuttal argument took the position that defendant was not a disciplinary problem. Defendant now asserts the jail record *97 that memorialized his 10-day suspension was inadmissible hearsay offered to prove his underlying conduct. (See People v. Wheeler (1992) 4 Cal.4th 284, 298-300 [14 Cal.Rptr.2d 418, 841 P.2d 938].) But, as we have seen, the record admitted into evidence here was silent regarding the cause for defendant’s suspension. It was not admitted to show his underlying conduct but only that he suffered a suspension of privileges. Accordingly, the record was properly admitted as a business or official record. (Evid. Code, §§ 1270, 1271; see People v. Ray (1996) 13 Cal.4th 313, 369 [52 Cal.Rptr.2d 296, 914 P.2d 846] (conc. opn. of George, C. J.).)
Defendant contends that neither the suspension record nor the “pruno” incident was properly admitted to rebut evidence of his satisfactory work performance while in jail. (See People v. Ramirez (1990) 50 Cal.3d 1158, 1193 [270 Cal.Rptr. 286, 791 P.2d 965]; People v. Rodriguez (1986) 42 Cal.3d 730, 791-792, and fn. 24 [230 Cal.Rptr. 667, 726 P.2d 113].) We disagree. Defendant offered evidence of his work performance to convince the jury that he could function satisfactorily as a prisoner. The prosecutor’s rebuttal evidence was directly relevant to cast doubt on that premise.
C. Exclusion of Evidence Regarding Prison Conditions
Defendant next argues the court erred in refusing to allow testimony by James Park, a prison consultant, regarding the security, classification, and management of inmates sentenced to prison for life without possibility of parole. We have recently rejected arguments involving similar proposed testimony, and find no reason to reconsider our holdings. (See People v. Quartermain (1997) 16 Cal.4th 600, 632-633 [66 Cal.Rptr.2d 609, 941 P.2d 788]; People v. Fudge, supra, 7 Cal.4th at pp. 1123-1124; People v. Daniels, supra, 52 Cal.3d at pp. 876-878.)
D. Refusal to Give Instructions on Defendant’s Addiction
Defendant contends the court erred in refusing to give special instructions permitting the penalty jury to consider his history of alcohol and drug addiction, and whether this addiction contributed to his criminal conduct. The court did instruct that the jury could consider the defendant’s lack of capacity to appreciate the criminality of his conduct, or conform to the law, due to mental disease or defect or the effects of intoxication. (See § 190.3, factor (h).) Additionally, the court instructed the jury to consider “any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant’s character or record that the defendant offers as a basis” for mitigation. (See § 190.3, factor (k); People v. Easley (1983) 34 *98 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) Moreover, the court also stated that “[i]f a mitigating circumstance or an aspect of a defendant’s background or his character . . . arouses sympathy or compassion, such as to persuade you that death is not the appropriate penalty, you may act in response thereto . . . .”
Defendant contends the instructions given were inadequate to permit the jury to consider his substance abuse disorder. We disagree. The court’s instructions clearly told the jury it could consider any mitigating, sympathetic, or extenuating circumstance, including defendant’s substance abuse disorder. (See People v. Ray, supra, 13 Cal.4th at p. 359 [factor (k) catchall provision broad enough to include defendant’s mental condition].)
E. Overruling Objection to Codefendant Robinson’s Closing Argument
Defendant next argues the court improperly overruled his objection to codefendant Robinson’s closing argument to the effect that Robinson was under the “substantial domination” of defendant, who “badgered” him into participating in the crime. The trial court ruled the argument was “within the scope of permissible argument” and observed that the jury would decide whether it was sufficiently supported by the evidence. We uphold that ruling.
The evidence showed that Robinson was a person of low intelligence who (1) functioned as a 12-year-old child, (2) joined in the plot to kidnap Carlene McDonald at the last minute, (3) was nodding off from heroin use just before the abduction, and (4) was kept awake by defendant. Contrary to defendant, we think this evidence could support an inference, and permit the argument, that he was the more dominant personality and induced Robinson to join the plot.
In any event, it is not reasonably possible that Robinson’s counsel’s mere argument to this effect could have affected the verdict. The jurors were aware from the court’s instructions that attorneys’ statements made during the trial are not evidence, and that the jury must decide all questions of fact in the case from the evidence and from no other source.
F. Prosecutorial Misconduct
Defendant complains of various instances of prosecutor misconduct during closing argument at the penalty phase. (See also ante, at pp. 91-93 [guilt phase claims].) These arguments lack merit.
*99 1. Argument as to Defendant’s Future Dangerousness
The prosecutor argued, over defense objection, that if defendant were sentenced to life imprisonment without possibility of parole, based on his earlier disciplinary record he could present a discipline problem to prison authorities, as he would have “nothing to lose,” and he “can try to get away with anything, and no one can give him one more day’s time.” The prosecutor also indicated, again over defense objection, that although defendant was evidently a talented guitar player, the authorities probably would not allow him to have a strung guitar in prison, as those strings “can be used for a lot more than just playing.”
As defendant acknowledges, we have held that prosecutorial argument regarding defendant’s future dangerousness is permissible when based on evidence of the defendant’s conduct rather than expert opinion. (E.g., People v. Danielson, supra, 3 Cal.4th at p. 721; People v. Fierro, supra, 1 Cal.4th at p. 249.) Here, the prosecutor’s remarks were proper argument derived from evidence indicating that defendant might cause disciplinary problems if sentenced to life imprisonment. The “guitar strings” argument was perhaps speculative but too trivial to have prejudiced the defense.
2. Reference to Charles Manson
Defendant unsuccessfully objected to the prosecutor’s response to a statement by defendant’s mother that defendant was “a nice person” whose life should be spared. The prosecutor argued, “To say Curtis Ervin is a nice person is like saying Charles Manson is the Messiah.” The prosecutor’s comment, which simply used Manson’s name to illustrate a point, was within the scope of fair comment on the evidence indicating that defendant helped kidnap and kill Carlene McDonald and committed other crimes.
3. Biblical References
The prosecutor, referring to defendant’s supposed religious habits, and without objection from defendant, compared him to the converted thief crucified with Jesus on the cross. The prosecutor observed, “Notice one thing, Jesus didn’t save him from being executed though, did he? He just saved his soul. Earthly punishment was handed down.”
Likewise without objection, the prosecutor relied on various Old Testament biblical verses that seem to approve the death penalty. (E.g., “And he that killeth any man shall surely be put to death.”) In response, defense counsel countered with his own biblical references, including admonitions to bestow mercy and forgiveness on sinners.
*100 Defendant correctly observes that the prosecutor’s reference to the biblical converted thief violated an earlier court order to avoid that subject during cross-examination. As defendant further notes, we have condemned prosecutorial reliance on the Bible as support or approval of the death penalty (People v. Roybal (1998) 19 Cal.4th 481, 519-521 [79 Cal.Rptr.2d 487, 966 P.2d 521]; People v. Hill (1998) 17 Cal.4th 800, 836-837 [72 Cal.Rptr.2d 656, 952 P.2d 673]; People v. Wash (1993) 6 Cal.4th 215, 260-261 [24 Cal.Rptr.2d 421, 861 P.2d 1107]), or prosecutorial invocations to a different or higher law than that found in the state Penal Code (People v. Bradford (1997) 14 Cal.4th 1005, 1063 [60 Cal.Rptr.2d 225, 929 P.2d 544]). The prosecutor’s repeated references to Old Testament verses seemingly approving capital punishment ran afoul of these authorities.
Defendant’s failure, however, to object to, or seek an admonition regarding, any of the prosecutor’s biblical references waived the point for appeal. (People v. Bradford, supra, 14 Cal.4th at p. 1061; People v. Wash, supra, 6 Cal.4th at pp. 259-260.) Moreover, in light of the court’s standard sentencing instructions and defense counsel’s own reliance on biblical text, we find defendant was not prejudiced by the prosecutor’s misconduct. (See People v. Roybal, supra, 19 Cal.4th at pp. 520-521.)
4. Minimizing Jury’s Responsibility for Death Verdict
The prosecutor also told the jurors that, “lest you feel a pang of conscience,” their task was to select the appropriate penalty for defendant, and not to be defendant’s “grim reapers” or “executioners.” Codefendant Robinson objected, and the court specially admonished the jurors that their individual decisions would determine whether the defendants lived or died, and “[t]he responsibility rests with you.” The prosecutor resumed his argument, agreeing with the court, but also noting that “You will decide [penalty], but you won’t be the ones to strap him in and do it, okay?”
Defendant now contends the court’s admonition was insufficient to cure the harm created by the prosecutor’s remarks. Defendant correctly observes that misconduct occurs when the prosecutor attempts to mislead the jury regarding the extent of its sentencing responsibilities. (See Caldwell v. Mississippi (1985) 472 U.S. 320, 330 [105 S.Ct. 2633, 2640, 86 L.Ed.2d 231]; cf. People v. Berryman (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40].) We find those authorities inapposite here. The prosecutor’s assurances regarding the jury’s role as nonexecutioner, though technically correct, were potentially misleading. But the court’s standard sentencing instructions and special admonition were sufficient to explain the jury’s ultimate responsibility for making the penalty determination.
*101 We conclude that, viewed separately or in the aggregate, the prosecutor’s various remarks during penalty phase closing argument did not amount to prejudicial misconduct.
G. Incompetent Counsel Claim
Defendant next asserts his trial counsel was incompetent in various respects during the penalty phase. We find the claim meritless. (See also ante, at pp. 78-79 [pretrial and jury selection phase incompetence claims], pp. 93-94 [guilt phase claims].)
1. Failure to Obtain Discovery of Codefendants’ Witnesses
Defendant asserts counsel was incompetent in failing to obtain discovery of his codefendants’ penalty phase witnesses. Defendant speculates that this discovery might have led the court and counsel to adopt some precautionary measures to minimize the potential prejudice resulting from McDonald’s “pristine and exemplary life history,” compared to his codefendants’.
As defendant acknowledges, no statutory basis exists for the discovery of codefendants’ penalty phase witnesses. (See §§ 1054-1054.7.) In any event, the point is too speculative to establish prejudice arising from counsel’s omission.
2. Failure to Object to Rebuttal Evidence Regarding Defendant’s Disciplinary Record
Defendant next asserts his counsel was incompetent in failing to anticipate and properly object to the prosecutor’s rebuttal “conduct” evidence that defendant had suffered a 10-day suspension and had possessed unlawful “pruno” while in county jail. (See ante, pp. 96-97.) As we previously stated, this evidence was properly admitted to rebut defendant’s showing of his good conduct in county jail while awaiting trial. Although defendant suggests his counsel should have withheld the good conduct evidence rather than open the door to rebuttal, this decision was clearly a tactical one that we cannot properly second-guess.
H. Constitutional Challenges
Defendant raises various constitutional challenges to the state death penalty law, asserting it (1) fails to narrow sufficiently the class of death-eligible defendants, (2) contains vague and unduly broad aggravating circumstances, (3) fails to require written jury findings, (4) fails to require all *102 aggravating factors, and the appropriateness of death, to be proved beyond a reasonable doubt, and (5) confers unlimited prosecutorial discretion to charge special circumstances or seek the death penalty.
We have repeatedly and recently rejected all these constitutional arguments. (See, e.g., People v. Ochoa (1998) 19 Cal.4th 353, 478-479 [79 Cal.Rptr.2d 408, 966 P.2d 442]; People v. Williams, supra, 16 Cal.4th at pp. 276-277; People v. Champion (1995) 9 Cal.4th 879, 950-951 [39 Cal.Rptr.2d 547, 891 P.2d 93].) We see no compelling reason for reconsideration of these decisions.
I. Disproportionate Penalty
Defendant contends that death is a disproportionate penalty for his offense. (See People v. Dillon (1983) 34 Cal.3d 441, 478-489 [194 Cal.Rptr. 390, 668 P.2d 697].) We find nothing disproportionate in imposing the death penalty for a planned and brutal stabbing and murder for hire of a defenseless victim. (See, e.g., People v. Padilla (1995) 11 Cal.4th 891, 961-962 [47 Cal.Rptr.2d 426, 906 P.2d 388].) He also asks for a “comparative sentence” review, a form of review we have consistently declined to exercise. (See People v. Rodrigues (1994) 8 Cal.4th 1060, 1196 [36 Cal.Rptr.2d 235, 885 P.2d 1]; People v. Bacigalupo, supra, 1 Cal.4th at p. 151.)
J. Exclusion of Jail Chaplain’s Opinion
In his supplemental brief, defendant argues that the court erred in failing to permit opinion testimony by an Alameda County jail chaplain, Daniel Coryell, who had conducted worship services and Bible studies for jail inmates. The chaplain did testify he found defendant’s participation in the worship services “consistent and extremely sincere.” The court sustained the prosecutor’s objection, however, to defense counsel’s question, “And did you form any opinion as to what should happen to him in this case?”
Defendant argues that he was entitled to introduce any facts or evidence that mitigate his offense (§ 190.3; Skipper v. South Carolina (1986) 476 U.S. 1 [106 S.Ct. 1669, 90 L.Ed.2d 1]), and that testimony by a person such as Chaplain Coryell, with whom defendant assertedly had a significant relationship, that defendant deserves to live, is proper mitigating evidence as “indirect evidence of the defendant’s character.” (People v. Ochoa, supra, 19 Cal.4th 353, 456; see also People v. Mickle (1991) 54 Cal.3d 140, 194 [284 Cal.Rptr. 511, 814 P.2d 290]; People v. Heishman (1988) 45 Cal.3d 147, 194 [246 Cal.Rptr. 673, 753 P.2d 629].)
The Attorney General, on the other hand, (1) questions whether the record supports a finding of a significant relationship between the chaplain and *103 defendant, and (2) observes that the opinions of expert witnesses on whether death is or is not an appropriate punishment in a particular case are generally held irrelevant and inadmissible. (People v. Mickle, supra, 54 Cal.3d at p. 196.) The Attorney General argues that such testimony on the ultimate punishment issue does not assist the jury in making its “normative, individualized penalty determination.” (Ibid.; cf. People v. Lucas (1995) 12 Cal.4th 415, 499 [48 Cal.Rptr.2d 525, 907 P.2d 373] [evidence of manner of execution irrelevant]; People v. Daniels, supra, 52 Cal.3d at p. 878 [testimony about impact of execution on defendant irrelevant].)
If we were to conclude that the trial court erred in failing to admit Chaplain Coryell’s opinion testimony, we would find any such error harmless in this case. As previously noted, the jury had heard the chaplain testify he found defendant’s involvement in the jail’s religious program “consistent and extremely sincere.” Assuming that this defense witness would have further opined that defendant had sufficiently redeeming qualities that rendered the death penalty inappropriate, still, in light of the whole record, it is not reasonably possible that the jury would have returned a different penalty verdict but for the assumed error.
K. Lack of Remorse
Defendant’s supplemental brief argues the court erred in allowing the prosecutor to argue defendant’s “total lack of remorse” as “another reason why factors in aggravation completely overwhelm any mitigation.” Defendant also complains of the prosecutor’s related observation that he was “still waiting to hear” any of defendant’s “witnesses say he’s truly sorry.”
We have held that “ ‘the presence or absence of remorse is a factor “ ‘universally’ deemed relevant to the jury’s penalty determination,” ’ ” and that the prosecutor may argue the defendant’s lack of evidence of his remorse. (People v. Frye (1998) 18 Cal.4th 894 [77 Cal.Rptr.2d 25, 959 P.2d 183]; see People v. Sims (1993) 5 Cal.4th 405, 465 [20 Cal.Rptr.2d 537, 853 P.2d 992].) Of course, the prosecutor may not comment on defendant’s own failure to take the stand as evidence of his lack of remorse, for such comments are fundamentally unfair, given defendant’s constitutional right to remain silent. (See People v. Frye, supra, 18 Cal.4th at pp. 1019-1020; People v. Fierro, supra, 1 Cal.4th at pp. 243-244; People v. Coleman (1969) 71 Cal.2d 1159, 1168-1169 [80 Cal.Rptr. 920, 459 P.2d 248].) In the present case, the prosecutor’s comments regarding defendant’s lack of remorse were unobjectionable, falling short of characterizing defendant’s attitude as an aggravating factor, and avoiding comment on defendant’s own silence. We find no error or misconduct.
*104 V. Conclusion
We affirm the judgment in its entirety.
George, C. J., Baxter, J., Werdegar, J., and Brown, J., concurred.

All further statutory references are to the Penal Code unless otherwise indicated.

 Bruton v. United States (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476]; People v. Aranda (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].