Filed 3/22/22  P. v. Smadi CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AHMAD TALAL SMADI,<br><br>    Defendant and Appellant. | B303708<br>(Los Angeles County<br> Super. Ct. No. PA090810) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed.

Bird Rock Law Group, and Andrea S. Bitar, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and J. Michael Lehmann, Deputy Attorney General, for Plaintiff and Respondent.

While on probation for two convictions for making criminal threats (Pen. Code, § 422, subd. (a)),[1] on April 12, 2018, defendant and appellant Ahmad Talal Smadi sent his probation officer an email. In his email, defendant stated that if he did not receive $10 million from the County of Los Angeles, and personal apologies from the judge who presided over his prior cases (the Honorable Hayden Zacky) and the prosecuting attorney (Los Angeles County Deputy District Attorney (DDA) Elena Abramson), defendant would execute both for treason. Each victim received the email, and defendant was arrested.

In a June 2018 information, defendant was charged with two counts of making criminal threats (§ 422, subd. (a)). The information also alleged that defendant had suffered two convictions in November 2013 for making criminal threats, each constituting a prior serious or violent felony conviction (§§ 667, subds. (a), (b)-(i), 1170.12, subds. (a)-(d)). Following a jury trial, defendant was convicted of both counts of making criminal threats.

Proceeding in propria persona at bifurcated sentencing proceedings, defendant filed motions to grant him probation and reduce his new convictions to misdemeanors. The court denied both motions and found the prior conviction allegations to be true. The court then reviewed, and denied, a motion filed by defendant's former counsel to strike the prior convictions under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*). Defendant was sentenced to 25 years to life on count 1, plus two consecutive five-year terms for the prior

---

[1] Subsequent references to statutes are to the Penal Code.

serious felony convictions (§ 667, subd. (a)). He was also sentenced to a concurrent term of 25 years to life on count 2.

On appeal, defendant contends that the court erred by denying his motion for acquittal (§ 1118.1) on both counts of making criminal threats. He also contends the court committed prejudicial error by refusing to instruct the jury with CALCRIM No. 3428, which provides that the jury may consider evidence that defendant was suffering from a mental disease or disorder when deciding whether he acted with a specific intent. Finally, defendant contends that we should remand the matter for the trial court to exercise its discretion to impose or strike the five-year sentence enhancements under Senate Bill No. 1393, which became effective one year before the trial court sentenced defendant. Finding no merit in these arguments, we affirm the judgment.

## FACTUAL BACKGROUND

A.   *Prosecution Evidence*

1.   *Events Preceding Charged Offenses*

DDA Abramson testified that she was the prosecuting attorney on both of defendant's criminal threats cases in late 2012. In the first case (the Van Nuys case), defendant had threatened to kill one of his roommates while holding a knife, and sent emails to his roommates threatening to "put two bullets" in the back of their skulls if he were to see them inside the home. In the second case (the San Fernando case), defendant threw a Molotov cocktail into his father's home while those inside the home were sleeping. Later that day, defendant sent his father an email stating, "If you don't come clean, you will die."

3

Judge Zacky presided over both cases in 2013. Judge Zacky testified that he had signed a search warrant in the San Fernando case based on an affidavit that alleged defendant had assaulted his mother, and had thrown a Molotov cocktail into his father's home. Through a global disposition in both cases, defendant pleaded guilty to two counts of criminal threats and one count of misdemeanor vandalism, and was sentenced to formal probation. Judge Zacky viewed defendant as "[v]ery respectful" and "highly intelligent."

Between May 2015 and April 2018, Los Angeles County Deputy Probation Officer Anthony Kramer oversaw defendant's probation in both the Van Nuys and San Fernando cases. When meeting with Officer Kramer (upwards of 70 times), defendant appeared very logical and showed no signs of being psychotic. After violating the terms of his probation in 2016,[2] defendant was evaluated by a forensic psychiatrist. According to Officer Kramer, defendant was never prescribed psychotropic medication by a healthcare provider.

According to Officer Kramer, as defendant became more comfortable, he admitted that he had "played up the whole psychosis" to avoid a long prison sentence. At no point during his time overseeing defendant did Officer Kramer feel the need to refer him to a mental health provider.

---

[2]     Judge Zacky testified that defendant had admitted to violating probation for possessing dangerous weapons and alcohol, and for sending threatening and harassing emails to an owner of a fitness studio.

2.	*Criminal Threats against Judge Zacky and DDA Abramson*

Around 7:00 a.m. on April 12, 2018, Officer Kramer received an email from defendant. The email, which was introduced into evidence by the prosecution, provided as follows:

"(1) All Jews must denounce the State of Israel as a terrorist nation. [¶] (2) All Arabs must denounce the State of Palestine as a terrorist nation. [¶] . . . [¶] Your [expletive] war leaked into 9/11 and that's my [expletive] territory. [¶] Your [expletive] Middle Eastern war became an American problem. [¶] So I just [expletive] fixed it.

"I am the executioner - in more ways than one. [¶] And what do I want in return for this oh so glorious gift of patriotic service?

"(i) $10 million from Los Angeles County for wrongful imprisonment. [¶] I'll put it to better use than any charity organization I've seen, heard of or worked with to date. [¶] And you already know that I'm donating that [expletive] to charity.

"(ii) A personal apology from D.A. Abramson and Judge Zacky.

"If you refuse, then I will execute Elena Abramson and Hayden Zacky for treason against the United States of America; because I can prove beyond a reasonable doubt that they deliberately, maliciously and/or by criminal neglect cooperated in my wrongful imprisonment. . . . [F]urthermore, my wrongful imprisonment is directly linked to my journalistic and patriotic efforts to secure justice for the 9/11 false-flag demolition operation of treason; therefore, Elena Abramson and Hayden Zacky knowingly and/or by criminal neglect aided and abetted the enemy, which is tantamount to treason.

"Now, mother [expletive]. [¶] Give me my check. [¶] . . . [¶]

5

"REMEMBER THIS LINE: I know how to make a bomb so big I could blow up half of Los Angeles County. [¶] . . . [¶]

"Who the [expletive] would stir up so much [expletive] without offering a solution?

"A psychotic individual. [¶] Or a [expletive] genius. [¶] I'll let a jury of my peers determine which of the two characterizes yours truly."

Shortly after Officer Kramer read the email, he received a call from DDA Abramson to discuss worrisome emails that defendant had purportedly sent that morning to Dr. Kory Knapke, a forensic psychiatrist who had analyzed defendant in 2016. (We describe those emails in greater detail, below.) Officer Kramer read DDA Abramson a portion of the email he had just received from defendant and forwarded the email to her.

Based on the content of the email and defendant's past behavior, DDA Abramson felt overwhelmed, worried about her safety, and concerned that the email constituted an immediate threat. To ensure she was safe that morning, DDA Abramson contacted the investigators in her office, and later the local police.

Around 12:00 p.m. the same day, a member of the Judicial Protection Unit informed Judge Zacky that a threat had been made against his life. After reviewing defendant's email later that afternoon, Judge Zacky felt greatly concerned. Aware that defendant had studied physics and mathematics in college, Judge Zacky "had no reason to

doubt" defendant's ability to create a bomb.[3]  The Judicial Protection Unit assisted in protecting Judge Zacky and his family.  Judge Zacky also made it a point to carry his firearm with him to court.

Officer Kramer arranged for defendant to be arrested later that day (April 12, 2018), during a pre-scheduled probation appointment.

C.    *Email from Doctor Knapke*

Officer Kramer testified that around 8:54 a.m. on April 12, 2018, he received an email from Doctor Knapke.[4]  In his email, Doctor Knapke stated as follows:

"My name is Dr. Kory Knapke, Forensic Psychiatrist for LA County Superior Court.  I received some disturbing email messages from a defendant that I evaluated two years ago in 2016.  It appears the defendant has carbon copied you the emails that he sent me, or at least one of them.

"Based upon my review of his email messages the defendant appears to be psychotic and/or manic and is decompensating.  I am concerned about the safety of the defendant's family and the community. . . .

"In the wake of many tragedies happening in our communities by unstable people, I wanted to reach out to law enforcement personnel to

---

[3]    DDA Abramson also testified that she was aware defendant had attended college for "chemistry or some other science."

[4]    DDA Abramson was copied on the email to Dr. Knapke sent by defendant.  Dr. Knapke was not called to testify as a witness.

alert you to the fact that it appears Mr. Smadi may be decompensating psychiatrically at the present time which increases his risk of danger to the community.

"At minimum, I think it might be helpful to . . . evaluate Mr. Smadi to assess whether he is currently a Danger to Himself or Danger to Others."

Officer Kramer did not arrange for defendant to be evaluated.

B.    *Defense Evidence*

Defendant did not testify at trial or call any witnesses to testify in his defense.

### DISCUSSION

A.    *Denial of Section 1118.1 Motion*

At the close of the prosecution's case-in-chief, defense counsel moved under section 1118.1 for acquittal of both counts of making criminal threats.[5]  Counsel argued that the prosecution had failed to present sufficient evidence from which a jury could find defendant's April 12, 2018 email to be an "unconditional or immediate [threat]." Denying the motion, the trial court stated that defendant's threat need

---

[5]    Section 1118.1 provides in relevant part that on motion of the defendant at the close of the evidence, the court "shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

not have been entirely unconditional, and that defendant need not have an immediate ability to carry out the threat.

On appeal, defendant contends the trial court's ruling was erroneous, as the email he had sent, though "admittedly inflammatory," was not sufficiently specific and unequivocal. We disagree.

In reviewing a motion for acquittal, we independently examine the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence from which a reasonable trier of fact could find defendant guilty beyond a reasonable doubt. (*People v. Veamatahau* (2020) 9 Cal.5th 16, 35; *People v. Dalton* (2019) 7 Cal.5th 166, 249.)

To prove the offense of making a criminal threat, the prosecution must to establish five elements: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228, citing *People v. Bolin* (1998) 18 Cal.4th 297, 337–340 & fn. 13 (*Bolin*); see § 422, subd. (a).)

"[P]rosecution under section 422 does not require an unconditional threat of death or great bodily injury." (*Bolin*, *supra*, 18 Cal.4th at p. 338.) Rather, the term "unconditional" (as well as the terms "unequivocal," "immediate," and "specific") refers only to a quality that must be sufficiently present "in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim." (*People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1157–1158 (*Stanfield*); see *Bolin*, *supra*, at pp. 339–340 [use of the terms do not impose unqualified requirements].) Even a conditional threat is actionable if it is based on a contingency "highly likely to occur." (*People v. Wilson* (2010) 186 Cal.App.4th 789, 806 (*Wilson*); accord, *Stanfield*, *supra*, 32 Cal.App.4th at p. 1158.)

"'A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does "not communicate a time or precise manner of execution, section 422 does not require those details to be expressed."'" (*Wilson*, *supra*, 186 Cal.App.4th at p. 806.) Rather, "'it is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422.' [Citation.]" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1433.)

The evidence in this case amply supports a finding that defendant's email constituted a sufficiently specific and unequivocal threat to kill both victims. In his email, defendant stated that he would "execute Elena Abramson and Hayden Zacky for treason against the United States of America" if two conditions were not met: the payment

10

of $10 million by the County of Los Angeles and a personal apology by both victims. It is undisputed that neither of those conditions would be met. (See *Wilson, supra,*186 Cal.App.4th at pp. 806–807.) Moreover, describing himself as an "executioner in more ways than one," defendant stated that he knew how to "make a bomb so big [he] could blow up half of Los Angeles County." Obviously, defendant communicated his specific intent to kill ("execute") DDA Abramson and Judge Zackey.

Relying on *In re Ricky T.* (2001) 87 Cal.App.4th 1132 (*Ricky T.*), and *In re George T.* (2004) 33 Cal.4th 620 (*George T.*), defendant contends that despite using "admittedly inflammatory" words, his email did not constitute a criminal threat, as "there was no history of violent behavior by [him] towards Judge Zacky or [DDA] Abramson." But neither *Ricky T.* nor *George T.* require that the defendant have had a history of violence against the victim. The courts in those cases reviewed the parties' history as part of the surrounding circumstances to determine only whether the facially ambiguous statements in those cases constituted criminal threats. (See *Ricky T.*, *supra*, at pp. 1135, 1137–1139 [considering surrounding circumstances given student's ambiguous statement to teacher, "I'm going to get you"]; *George T.*, *supra*, at pp. 635–638 [the "incriminating circumstances in this case are noticeably lacking" for the poem stating, "For I can be the next kid to bring guns to kill students at school"].) Here, defendant's email left no ambiguity. He unequivocally declared his intent to execute the victims, who were, respectively, the prosecutor and presiding judge in his prior

11

cases. In short, substantial evidence supports the instant charges, and the trial court properly denied the section 1118.1 motion for acquittal.

B.     *Refusal to Instruct the Jury with CALCRIM No. 3428*

Following the close of evidence, defense counsel requested that the trial court instruct the jury with CALCRIM No. 3428 [Mental Impairment: Defense to Specific Intent or Mental State],[6] based on Dr. Knapke's email that defendant may be psychotic or decompensating. The trial court denied the request, and reasoned that the trial evidence did not establish that defendant was diagnosed with mental disorder or was suffering from an impairment that would impact his ability to form a particular mental state.

Despite the court's refusal to give the pinpoint instruction, during closing argument, defense counsel referred to Dr. Knapke's email to argue that defendant was decompensating and "was delusional. Psychotic. That . . . definitely has an impact on his intent, to use a third party intermediary. So, again, if he's decompensating, how is he manifesting all this [*sic*] brilliant idea?"

On appeal, defendant renews his trial argument that Dr. Knapke's email provided substantial evidence to support instructing the jury with CALCRIM No. 3428. We disagree.

---

[6]     CALCRIM No. 3428 provides in relevant part: "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder). You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime."

"Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent," and is inadmissible "to show or negate the capacity to form any mental state." (§ 28, subd. (a).) Making criminal threats is a specific intent crime, and requires both the general intent of making a threatening statement, and the specific intent "that the statement . . . be taken as a threat." (§ 422, subd. (a); see *People v. Alvarado* (2005) 125 Cal.App.4th 1179, 1186–1188.)

"CALCRIM No. 3428 is a pinpoint instruction that must be given only if requested by the defendant, and only if substantial evidence supports the defense theory that defendant's mental disease or disorder affected the formation of the relevant intent or mental state. [Citation.] Also, expert medical opinion testimony is necessary to establish that a defendant suffered from a mental disease, mental defect, or mental disorder within the meaning of CALCRIM No. 3428, because jurors cannot make such a determination from common experience." (*People v. Larsen* (2010) 205 Cal.App.4th 810, 824 (*Larsen*), citing *People v. Ervin* (2000) 22 Cal.4th 48, 91 (*Ervin*); *People v. Moore* (2002) 96 Cal.App.4th 1105, 1116–1117 (*Moore*); *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1229–1230; *People v. Cox* (1990) 221 Cal.App.3d 980, 987.)

Cases in which CALCRIM No. 3428 or its predecessor, CALJIC No. 3.32, have been given to the jury "have all done so where expert medical testimony was adduced on the question of [the] defendant's mental disease, etc." (*Moore, supra,* 96 Cal.App.4th at p. 1117; see *Larsen, supra,* 205 Cal.App.4th at p. 824.)

13

For example, in *People v. Panah* (2005) 35 Cal.4th 395 (*Panah*), the only evidence in support of the defendant's request for the mental disease instruction was from an emergency physician who testified that the defendant was psychotic, agitated, delusional, and under the influence of controlled substances the day after the crime. (*Id.* at p. 484.) However, witnesses who saw the defendant between the crime and the emergency room visit testified that he interacted with them with no appearance of being under the influence of any substance. (*Id.* at pp. 484–485.) The Supreme Court concluded that the physician's testimony "established that defendant *may have* suffered from . . . psychosis and, at some point, his condition deteriorated. This does not constitute evidence of defendant's mental state at the time of the commission of the crime," and was thus insufficient to support giving the instruction. (*Id.* at p. 485, italics added; accord, *Moore, supra,* 96 Cal.App.4th at pp. 1116–1117 [medical expert did not provide opinion that the defendant suffered from a mental disease at the time of the offense].)

In contrast, the trial evidence in *People v. Smithey* (1999) 20 Cal.4th 936, involved testimony by three experts who analyzed the defendant's "mental deficits" and provided opinions that he had suffered from organic brain damage, diffused brain dysfunction, mild mental retardation, and "classic amphetamine psychosis syndrome." (*Id.* at p. 955.) In addition, the experts testified that the defendant "would not have committed the crimes if he had not suffered from these mental disorders." (*Id.* at pp. 955–956, 959.) Based on this evidence, the

Supreme Court concluded that the court properly instructed jury with CALJIC No. 3.32. (*Id.* at pp. 969, 986–988 & fns. 15, 16.)

Here, defendant did not introduce expert testimony or evidence that he suffered from a specific mental disease, disorder, or impairment at the time he sent his threatening email. In his email, Dr. Knapke described his supposition that defendant was perhaps psychotic or manic and was possibly decompensating; but Dr. Knapke had not performed any current analysis of defendant's condition and did not purport to make a specific diagnosis. (Compare *Panah, supra,* 35 Cal.4th at p. 485; *Moore, supra,* 96 Cal.App.4th at pp. 1116–1117.) Absent expert testimony establishing that defendant was suffering from a recognized mental condition, the evidence was insufficient to support giving CALCRIM No. 3428.

Even assuming the court erred by refusing to give CALCRIM No. 3428, the error was harmless. Prejudice resulting from the failure to give a pinpoint instruction is assessed under the state constitutional standard requiring reversal only if it is reasonably probable the jury would have reached a different result if the omitted instruction had been given. (*Larsen, supra,* 205 Cal.App.4th at p. 829; see *Ervin, supra,* 22 Cal.4th at p. 91; *People v. Watson* (1956) 46 Cal.2d 818.)

Here, it is not reasonably probable the jury would have reached a different result if CALCRIM No. 3428 had been given. The jury instructions as a whole provided the applicable law, instructed the jury on the necessary elements of making criminal threats, and informed the jury of its ability to use circumstantial evidence to establish whether defendant harbored the requisite intent. (See, e.g., CALCRIM Nos.

15

1300 [Criminal Threats Defined]; 225 [Circumstantial Evidence: Intent or Mental State]; 251 [Union of Act and Intent: Specific Intent or Mental State].) Moreover, within the context of these instructions, defense counsel argued (without contradiction according to the applicable law as explained to the jury) that the evidence negated a finding of intent. Using the words of Dr. Knapke's email, counsel argued that defendant's decompensation and psychosis deprived him of the capacity to form the requisite intent. In light of the foregoing, we cannot say that it is reasonably probable the jury would have reached a different result had it received CALCRIM No. 3428.

C.    *Senate Bill No. 1393*

Finally, defendant contends that we should remand this case for the trial court to consider exercising its discretion to strike the five-year sentence enhancements (§ 667, subd. (a)(1)), under Senate Bill No. 1393. Signed into law September 30, 2018, Senate Bill No. 1393 amended sections 667 and 1385 to provide the trial court with discretion to strike the enhancements in the interests of justice. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971 (*Garcia*); Stats. 2018, ch. 1013, §§ 1-2.) The new law took effect January 1, 2019, approximately one year before defendant was sentenced in this case. Representing himself at the sentencing hearing, defendant never requested that the court exercise its discretion under the amended law to strike either enhancement.

Defendant asserts a remand is in order because the record does not affirmatively demonstrate that the trial court was aware it had the

16

discretion to strike the section 667, subdivision (a)(1) enhancements. The People contend, and we agree, that defendant has forfeited the argument by failing to raise it below.

"'In general, the forfeiture rule applies in the context of sentencing as in other areas of criminal law.' [Citation.]" (*People v. Trujillo* (2015) 60 Cal.4th 850, 856.) "It is true that . . . a defendant forfeits on appeal any 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' in the absence of objection below. [Citations.]" (*People v. Wall* (2017) 3 Cal.5th 1048, 1075.)

Conceding he did not raise the issue below, defendant requests that we consider the argument on the merits because: (1) he was proceeding in pro. per. during the sentencing hearing; and (2) his prior counsel filed a motion to strike his prior strike allegations under *Romero, supra,* 13 Cal.4th 497.

Defendant's election to represent himself during the sentencing hearing does not excuse him from making timely requests where required. (See *People v. Barnum* (2003) 29 Cal.4th 1210, 1221 ["a principle deeply rooted in the law [is] that a 'defendant who chooses to represent himself assumes the responsibilities inherent in the role which he has undertaken,' and 'is not entitled to special privileges not given an attorney'"].) As amended by Senate Bill No. 1393, sections 667 and 1385 had been in effect for over 11 months before defendant was sentenced. Whatever reason defendant may have had for the court to consider striking either enhancement, he did not make any request. The issue has therefore been forfeited.

Even considering the argument on the merits, defendant has not demonstrated how the trial court's sentencing decision was irrational or arbitrary. In the absence of such showing, we presume the court understood and correctly applied the law. (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1178–1179; *People v. Brown* (2007) 147 Cal.App.4th 1213, 1228–1229; *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977–978.) We also note that the record suggests the court was aware of its discretion under the amended law.[7] Thus, on this record, we cannot conclude that the court would have changed its sentencing choices had defendant requested that the court exercise its discretion to strike one or more of the five-year enhancements.

//

//

//

//

//

//

//

//

---

[7] Former defense counsel's *Romero* motion stated that under the law as amended by Senate Bill No. 1393, the trial court could "exercise its discretion whether to strike or dismiss a prior serious felony conviction for sentencing purposes." (Citing *Garcia, supra,* 28 Cal.App.5th at p. 971; see *ibid.* [noting that amended law pertains to the exercise of discretion "to dismiss or strike the five-year consecutive term" imposed under section 667, subd. (a)].) It appears defense counsel confused the scope of Senate Bill No. 1393, as the motion requested only that the court strike the prior strike allegations under *Romero*.

18

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.

We concur:


MANELLA, P. J.


CURREY, J.