Filed 1/18/23  P. v. Bonilla CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAVIER FRANCISCO BONILLA,<br><br>    Defendant and Appellant. | D080020<br><br><br><br>(Super. Ct. No. RIF1902977) |

APPEAL from a judgment of the Superior Court of Riverside County, Mark E. Johnson, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Melissa Mandel and Adrian R. Contreras, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Javier Francisco Bonilla of committing a lewd or lascivious act on a child under age 14 (Pen. Code,[1] § 288, subd. (a); count 3)

---

[1]    Undesignated statutory references are to the Penal Code.

and attempted lewd or lascivious acts on a child under age 14 (§§ 664/288, subd. (a); counts 4 and 5). The jury deadlocked on a charge of aggravated sexual assault of a child under age 14 (§ 269, subd. (a)(4), count 1); therefore, the court declared a mistrial on that count. The court granted the defense's motion for a judgment of acquittal on a charge of lewd or lascivious act by use of force on a child under age 14. (§ 288, subd. (b)(1), count 2.)

Following a second trial on the count 1 charge, a jury found Bonilla not guilty. The court sentenced him to eight years in state prison for his convictions.

Bonilla unsuccessfully moved for a new trial on grounds of ineffective assistance of his first counsel, and raises that issue as his sole contention on appeal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*First Trial: Prosecution Case*

As Bonilla does not challenge the sufficiency of the evidence to support his convictions, we briefly summarize the facts to provide context for his contention.

*S.T.'s Testimony*

S.T., who was 19 years old at the time of trial, testified that when she was four or five years old, she and her mother lived temporarily in Riverside County with her grandmother, who is married to Bonilla. S.T. testified Bonilla, who she called "Papa," touched her inappropriately.

*Count 1 (Oral Copulation Charge)*

S.T. testified Bonilla orally copulated her when she was about four years old. It happened one evening in December, after her mother and grandmother left the house to get pizza. She went to Bonilla's bedroom, where he was on his bed watching television. He pulled down her pajama

2

pants and underwear.  Although she kept telling him "no," he would not stop orally copulating her.  She froze because she did not know what to do.  When her mother and grandmother returned and opened the bedroom door, Bonilla threw S.T. off the bed, and warned her to keep quiet about what had happened.  S.T. put her underwear on backward, and went to the kitchen, where her mother noticed her underwear and scolded her.  S.T. did not tell her mother and grandmother about Bonilla's actions because she was afraid Bonilla would hurt her.

*Count 3* (*Pinching Incidents*)

When S.T. was between four and seven years old, Bonilla frequently pinched her nipples and her body, hurting her.  He called the pinches "mosquito bites" in a taunting tone, and would laugh about them.  Bonilla usually did not pinch her nipples when other people were present.

*Count 4* (*Penis Exposure Incident*)

S.T. testified that when she was about five years old, Bonilla exposed his penis to her when she entered his bedroom to tell him dinner was ready.  While Bonilla lay on his back on the bed, he told her, " 'Do you want to see it?' "  He then pulled down his underwear and pants, pulled out his penis, and laughed.  S.T. told him, "No," and ran out of the room.

*Count 5* (*French Kiss Incident*)

S.T. testified that when she was about 6 years old, Bonilla had a shed in the backyard that he used as a "man cave."  Once, when S.T. went there, he told her, " 'Let me teach you how to French kiss,' " and locked the door, putting a sledgehammer against it.  Bonilla puckered his lips and said, " 'You go like this.' "  S.T. pushed him away and said, " 'No, no.' "  Bonilla cornered her and got within two feet of her.  She managed to open the door, and ran into the house.  S.T. told no one about these incidents until 2016.

On redirect examination of S.T., the prosecutor noted how emotionally difficult it was for S.T. to testify, "And as you sit here this afternoon, you've been pretty emotional. Would you agree?" S.T. replied, "Yeah."

*S.T.'s Mother's Testimony*

S.T.'s mother testified about the December incident when S.T. was four years old and she left her with Bonilla while she went to buy pizza. She remembered that upon her return, she was surprised to see S.T. had on her underwear backward, and she scolded S.T. However, S.T.'s mother did not think much about the incident. Years later, her cousin admitted to her that Bonilla had sexually molested her as a child. S.T.'s mother immediately asked S.T., who was then 15 years old, whether Bonilla had molested her. S.T. then told her mother and grandmother about the different incidents.

*S.T.'s Grandmother's Testimony*

S.T.'s grandmother testified about the pizza incident. She remembered telling S.T.'s mother not to be so hard on S.T. for having her pajama pants inside out.

The grandmother also testified that when she and Bonilla were newly married, he used the term "tickle spot" with her as a term of affection. She described it as "[l]ike play talking when you're going to get together."

She testified that after she talked to Bonilla about S.T.'s claims against him, he said, "I can't believe that she would betray me like this." That phrasing was striking to her because it implied S.T. "betrayed a secret." Another time, Bonilla said of S.T.: "She came to me. She put her thing on my thing."

4

*Defense Case*

*Defense Objections During S.T.'s Testimony*

During direct examination of S.T., defense counsel successfully interposed several objections that the prosecutor was asking leading questions. The court also sustained objections that certain questions were asked and answered, or called for hearsay. Further, when the prosecutor asked S.T., whether she harbored "any hard feelings" against Bonilla, the court sustained defense counsel's relevancy objection.

On S.T.'s cross-examination, defense counsel asked several questions aimed at probing her memory regarding the oral copulation charge: what television show Bonilla was watching; whether the bedroom window was open or closed; whether Bonilla was on top of the covers or under them; what he was wearing; what colors were S.T.'s underwear and Bonilla's pants; whether Bonilla was circumcised or uncircumcised. S.T. answered most of those questions with "I do not remember," "I don't really know," or "I can't say for sure." Defense counsel challenged S.T.'s recollection of her 2016 report to police, pointing out she did not mention that when Bonilla exposed his penis to her, he asked if she wanted to touch or see it.

Also during S.T.'s cross-examination, defense counsel prefaced one of his questions with, "I know you hate talking about this, but I have to ask a couple more questions about the [oral copulation incident]." Defense counsel did not ask S.T. about the pinching incidents.

*Bonilla's Direct Testimony*

Bonilla testified at trial and denied all of the charged misconduct. Regarding the oral copulation charge, he corroborated parts of S.T.'s account, confirming that S.T. was four years old at the time, it was December, he was left alone at home with S.T., and S.T. entered his bedroom while he watched

5

television.  However, he claimed she jumped on the bed, sat on her knees, pointed to her vagina and said she had a "tickle spot," and asked him if he wanted to see and touch it.  He told her no, and directed her to talk to her mother about that.  S.T. rolled off the bed.  At that exact moment, her mother entered the bedroom and asked where S.T. was.  Bonilla replied that she was on the floor.  S.T. and her mother left the room.  He never told S.T.'s mother or grandmother about that incident.

Bonilla testified that about two weeks later, he was asleep in his bed and woke up to find that S.T. had taken his hand and was rubbing her vagina with it.  He did not tell his wife or stepdaughter about this incident until after S.T. spoke to police.

*Cross-Examination of Bonilla*

On cross-examination, the prosecutor asked Bonilla, "Now, as you sit here today, you're not denying that there was any sexual inappropriate contact between you and [S.T.], right?  Bonilla replied, "I'm not denying it, no."  The prosecutor continued, "But you're saying that . . . you were not the person who initiated it?  It was all [S.T.?]"  Bonilla replied, "That's true."

The prosecutor confronted Bonilla with his wife's testimony that Bonilla had used the term "tickle spot" to refer to intimacy between them.  Bonilla stated he did not remember using that term with his wife.  The prosecutor also asked about Bonilla's wife testimony that when they learned about S.T.'s accusations against him, he offered to apologize to S.T. if he had done anything wrong, even though he insisted S.T. had wronged him.

In discussing what he considered S.T.'s "inappropriate" conduct as a five-year-old, Bonilla admitted asking his wife why God would put S.T. here to toy with him.  He also believed S.T. came to them "with a Satan on her shoulder."

6

Bonilla claimed S.T., her mother and grandmother made up their testimony against him. The prosecutor asked him, "they are lying on you for no reason at all? Bonilla responded, "Well, they hate my guts." When the prosecutor asked Bonilla why they would lie, Bonilla replied, "I don't know. To persecute me, throw me in jail."

The jury viewed a video of Bonilla's interview with police.

*Defense Closing Arguments*

Defense counsel in closing arguments highlighted the contradictions between S.T.'s recollection of the original incidents and what she reported to police several years later, and implied she was lying: "So [S.T.] tells [the sheriff's deputy] that in the one incident when Mr. Bonilla exposed himself to her, he's lying in bed naked, he wiggles his penis at her, and she exits the room. The People would have you believe that that's a minor discrepancy. Well, that's a major discrepancy. If she's lying about this, what else is she lying about? [¶] Now, she said when she was talking about that incident, ['Bonilla] pulled down his pants, he pulled down his underwear, he pulled out his penis.['] Now, I asked her a question that obviously would be completely inappropriate for a five-year-old, but I'm not asking a five-year-old. I'm asking a woman who was almost 20. [']Was [Bonilla] circumcised?['] She said, 'I don't know. He had his penis,' and she made a hand gesture, like a claw almost, and she couldn't see if he was circumcised or not. Okay. Fine. I asked her, 'Was he naked?' [She said,] 'No. He was wearing pants.' I said, 'What color were they?' She said, 'I don't remember, but they were dark.' That's not what she told [the sheriff's deputy] back in 2016, just four years ago. But for whatever reason, she's got an incredible memory as to what happened to her when she was four and a half, five years old, down to the last

7

detail, ladies and gentlemen. Including the fact that she was overly traumatized by this act of being orally raped, as she put it."

Defense counsel added, "The other thing [S.T. told an officer] that was different was that Mr. Bonilla grabbed her as she walked in the door that night, and he put her on the bed and he had her take her clothes off. That's different. That's not a minor change here. These are significant. If she's lying about one thing, what else is she lying about?"

Defense counsel also sought to rehabilitate Bonilla with the jury: "Now, you've heard Mr. Bonilla testify. He's not a very sophisticated man. He expresses himself in the way that he expresses himself. Some of the things he said he clarified. Some of the things he said he basically said, 'That's not what I meant.' You're going to have to determine what weight you give to that."

*Second Trial and New Trial Motion*

The trial court appointed a different attorney to represent Bonilla in the second trial, where Bonilla did not testify. That jury found Bonilla not guilty of count 1.

Bonilla subsequently moved for a new trial, arguing the verdict in the first trial was contrary to the evidence, and his first trial counsel provided ineffective assistance by failing to adequately impeach the witnesses with their prior inconsistent statements.

The People countered that Bonilla had retained a private attorney with over 19 years of experience. They further argued the two trials were substantially different because Bonilla did not testify in the second trial, and Bonilla's second attorney benefited from being able to impeach the witnesses with their testimony from the first trial.

8

The same judge who had presided over the first trial heard this motion and denied it: "I don't think this meets that standard [for an ineffective assistance claim]. I honestly don't think it's even close. I think things differently would have been done, but I do not believe the standard has been met. Secondly, one of the other grounds [for the new trial motion] was the verdict was contrary to the evidence. I mean, whether you want to believe somebody or not, I had somebody up here testifying that these things happened. I think it's hard once you have that, if a jury decides to accept that evidence in their sound judgment to accept it . . . . There was evidence and testimony to support their findings." The court stated that defense counsel did a "pretty good job," and "seemed to cover all the relevant areas and the relevant areas of attack." The court summarized it ruling: "And was it the hallmark case of advocacy? No. But was it effective assistance? Yes."

## DISCUSSION

Bonilla contends we must reverse his convictions because his first trial counsel was ineffective for "failing to adequately investigate readily ascertainable facts and failing to properly impeach prosecution witnesses." (Capitalization omitted.) He specifically contends his counsel "failed to cover count 3 and 4 *in toto*, asking no impeachment questions on those counts, and no impeachment questions of [S.T.'s mother or grandmother] on counts 3, 4, and 5." He contrasts this with counsel at the second trial, who asked more questions regarding the different incidents, and elicited contradictions between S.T.'s testimony and her statements to police.[2]

---

[2]    Bonilla elaborates: "At cross-examination in the second trial, second counsel confronted S.T. with her statement to [an investigator] that the shed incident was the last incident, while she told [a sheriff's deputy] it was the first, and that she told [the sheriff's deputy] that she was four years old at the time. . . . Second counsel also confronted S.T. with the inconsistency

9

A.  *Applicable Law*

Although ineffective assistance of counsel claims are "[u]sually . . . 'more appropriately decided in a habeas corpus proceeding[,]' . . . a defendant may raise the issue of counsel's effectiveness as a basis for a new trial, and, to expedite justice, a trial court should rule '[i]f the court is able to determine the effectiveness issue on such motion.' [Citation.]  To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

"[T]o what extent and how to cross-examine witnesses" are among "the wide range of tactical decisions competent counsel must make." (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.)  " 'As to whether certain witnesses should have been more rigorously cross-examined, such matters are

---

between her testimony (that she was in the house and sent to the shed to get [Bonilla] for dinner), and her statement to [an investigator] that she had been playing in the garden; her testimony that [Bonilla] said 'let me teach you how to French kiss,' [was] not included in her account to [an investigator]; her testimony that she brushed past [Bonilla] and telling [a sheriff's deputy] that she pushed [Bonilla] away; her testimony that she moved the sledgehammer and unlocked the door before running out and telling [an investigator] first that she ran out while [Bonilla] was trying to lock the door, then adding the hammer and unlocking later in the conversation; her testifying at the first trial that she ran upstairs and stayed away from [her mother and grandmother], whereas at the second trial she testified that she went to her mother and grandmother.  . . .  [¶]  Second counsel showed S.T. a June 14, 2006 Google photograph of the property that had no shed: the shed had not yet been built.  . . .  S.T. then responded that she now thought the shed was probably built in late 2006."

10

normally left to counsel's discretion and rarely implicate inadequacy of representation.' " (*People v. Williams* (1997) 16 Cal.4th 153, 217.) A " 'trial counsel's tactical decisions are accorded substantial deference' " and " '[a] reviewing court will not second-guess trial counsel's reasonable tactical decisions.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1185; *Strickland, supra,* 466 U.S. at pp. 689-690.) "If the record on appeal ' " 'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." ' " (*People v. Vines* (2011) 51 Cal.4th 830, 876, overruled on other grounds by *People v. Hardy* (2018) 5 Cal.5th 56, 104; see also *People v. Hoyt, supra,* 8 Cal.5th at pp. 958-960.)

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland, supra,* 466 U.S. at p. 686.)

B. *Analysis*

In evaluating Bonilla's claim, we review the record for tactical reasons defense counsel had for the scope of his cross-examination. In light of the fact Bonilla admitted at trial that the sexually inappropriate conduct occurred but that S.T. initiated it, defense counsel faced a near impossible task of convincing the jury to believe Bonilla as opposed to S.T. Further, S.T. was emotional when she testified about the sensitive topic of her being the victim of child molestation; therefore, she was potentially a sympathetic witness. By contrast, Bonilla in his police interview had blamed S.T. for initiating the sexually inappropriate acts. Defense counsel could have reasonably decided to limit his cross-examinations to avoid the appearance of being aggressive

11

towards S.T. and her mother and grandmother, and turning the jury against Bonilla. Further, as we pointed out, Bonilla's first trial counsel instead interposed numerous objections during the prosecutor's direct examination of S.T. In this way, counsel obtained the benefit of challenging S.T.'s account and streamlining the scope of S.T.'s testimony, while minimizing the prospects of appearing to attack the sympathetic victim. Under these circumstances, as a tactical matter, defense counsel was well within the scope of his responsibility to curtail cross-examination. We "keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, [we] recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (*Strickland, supra,* 466 U.S. at p. 690.)

As to the prejudice prong of the *Strickland* test, there is no reasonable probability Bonilla would obtain a different first trial result but for counsel's failure to investigate further or more fully cross-examine S.T., her mother and grandmother. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Strickland*, *supra*, 466 U.S. at p. 694.) As stated, the first trial counsel during S.T.'s cross-examination and in closing argument challenged S.T.'s credibility; pointing to her recollection of the incidents from when she was around four or five years old, and the discrepancies in what she told police. Counsel twice argued to the jury that if S.T. was lying about a minor detail, then she possibly was lying about other more significant matters. We conclude defense counsel adequately accomplished his goal of undermining S.T.'s credibility on cross-examination. "We rarely second-guess counsel's cross-examination tactics . . . . [Citation.] Moreover, defendant does not . . . explain how counsel's cross-examination . . .

12

could have prejudiced him in light of the other substantial incriminating evidence in the case." (*People v. Ervin* (2000) 22 Cal.4th 48, 94.)

In comparing the performance of counsel in the two trials, we point out that Bonilla did not testify before the second jury, and that fact likely was the significant difference resulting in his acquittal on the lone charge presented. As the first counsel's conduct did not so undermine "the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result" (*Strickland v. Washington, supra,* 466 U.S. at p. 686), we conclude the trial court did not abuse its discretion in denying Bonilla's new trial motion.

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.

13